**In re Will Clay PERRY, Debtor.**

**No. 08–32362–H4–11.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Feb. 24, 2010.

324

John Richard Millard, Law Office of John Millard, PC, John Wesley Wauson, Matthew Brian Probus, Wauson Probus, Sugar Land, TX, Ray J. Black, Jr., Law Offices of Ray J. Black, Jr., Houston, TX, for Debtor.

Stephen Douglas Statham, Office of U.S. Trustee, Houston, TX, for U.S. Trustee.

**MEMORANDUM OPINION REGARDING ESTIMATION OF THE CLAIMS OF UNITED DEVELOPMENT FUNDING, L.P. AND UNITED DEVELOPMENT FUNDING III, L.P.**

[Main Case Docket No. 695][1]

JEFF BOHM, Bankruptcy Judge.

### I. Introduction

The Purpose of this Memorandum Opinion is to set forth this Court's findings of fact and conclusions of law regarding its estimation of certain claims for plan confirmation procedures. The Court conducted

1. All docket cites are to the adversary docket except when the main case docket is explicitly cited. In the main case, this Memorandum Opinion relates to main case docket no. 695, which is the Debtor's Motion for Estimation of Claims. In this adversary proceeding, the Memorandum Opinion relates to adversary docket no. 23, which is an order that this Court issued abating the adversary proceeding. The Court abated this proceeding while this Court estimated the claims of the defendants in this adversary proceeding.

a two-day mini trial in order to estimate the claims of two large claimants in this Chapter 11 case. The claims, which are the subject of an adversary proceeding, involve relatively complex areas of the law, primarily usury. The Court hopes that by issuing its estimation ruling in writing, the parties will be better able: (1) to narrow the issues to be tried in a full-blown trial on the merits; and (2) to assess whether filing a motion for summary judgement would be appropriate.

## II. Procedural Background

On July 23, 2009, the Plaintiffs—WC Southern Colony Development, LLC (Southern Colony); Hidden Lakes Investments, LP (Hidden Lakes); and Will Clay Perry (Perry)—filed a complaint entitled "Plaintiffs' Original Complaint" (the Complaint) [Docket No. 1] naming United Development Funding, LP (UDF) and United Development Funding III, LP (UDF III) as defendants (together, "the Defendants"). The Complaint requests the disallowance of the following Proofs of Claim, each of which arose from Perry's guarantees of a series of loans made by UDF and UDF III:(1) Proof of Claim number 43 by UDF III; (2) Proof of Claim number 44 by UDF; (3) Proof of Claim 45 by UDF III; and (4) Proof of Claim 46 by UDF III. In addition to the disallowance of these Proofs of Claim, the Complaint seeks: (1) actual damages pursuant to Tex. Fin.Code §§ 305.003 and 305.004 in favor of Hidden Lakes and Southern Colony; (2) equitable subordination of any claim that this Court may allow in favor of UDF or UDF III; and (3) court costs and reasonable attorneys' fees in favor of Hidden Lakes and Southern Colony.

On August 24, 2009, UDF and UDF III filed a "Motion to Dismiss for Lack of Subject Matter Jurisdiction, for Failure to State A Claim Upon Which Relief Can be Granted and, Alternatively, for More Definite Statement" [Docket No. 10]. Shortly thereafter, on August 28, 2009, the Plaintiffs filed an amended complaint entitled "Plaintiffs' First Amended Complaint" [Docket No. 12]. On September 8, 2009, the Defendants responded by filing a "Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction, for Failure to State a Claim Upon Which Relief Can Be Granted and, Alternatively, for More Definite Statement and Brief in Support Thereof" (the Second Motion to Dismiss) [Docket No. 14]. On October 9, 2009, the Plaintiffs filed "Plaintiffs' Motion For Leave to File Second Amended Complaint" (the Motion to Amend) [Docket No. 19], which was accompanied by "Plaintiffs' Second Amended Complaint" (the Second Amended Complaint) attached as Exhibit A. On October 14, 2009, the Court held a hearing on the Second Motion to Dismiss, and took the matter under advisement. On October 22, 2009, this Court issued an order [Docket No. 23] granting leave to the Plaintiffs to file the Second Amended Complaint and abating the adversary proceeding until the Court could hold a mini-trial to estimate the claims of UDF and UDF III. With the issuance of this Memorandum Opinion on the estimation of these claims, the Court will now set a status conference to discuss the posture of the adversary proceeding with the parties' counsel.

The Court held a mini-trial on November 19 & 20, 2009 (the Hearing). The Court set the Hearing so that a timely confirmation hearing can be held—*i.e.,* so that there would not be the inevitable substantial delay in the main case while the parties fully litigated, for months if not years, the amount of the claims to a final judgment.[2]

---

2. No plan confirmation hearing has yet been held, but the Court intends to hold a status

At the Hearing, this Court heard testimony from the following witnesses:

- (1) Dwayne Iselt (Iselt), a land developer employed by Perry Properties to develop the Hidden Lakes Property. Iselt was subsequently hired by UDF to assist with bringing the Hidden Lakes Property into compliance with various legal requirements;

- (2) Patricia Osenbaugh (Osenbaugh), an appraisal expert who holds a Masters Degree in Land Economics and Real Estate as well as MAI and CCIM designations. Osenbaugh also has over 20 years of experience as an appraiser. Osenbaugh was hired by the Plaintiffs to appraise the Hidden Lakes and Southern Colony Properties;

- (3) Perry, a Plaintiff in this adversary proceeding and the Debtor–in–Possession in the main case. Perry is a limited partner in W.C. Perry Properties, LP (Perry Properties); and

- (4) Mehrdad Moayedi (Moayedi), an experienced land developer and an agent of the purchaser of the Hidden Lakes property at a foreclosure sale, CTMGT LP (CTMGT). Moayedi has worked with UMTH Land Development, LP (UMTH), the general partner of UDF III, on a number of projects in the past.

At the Hearing, the Court also admitted the following exhibits: (a) Plaintiffs' Exhibits 2–10, 12–41, 44, and 97–107 (admitted without objection; Plaintiffs' exhibits 12–41 were admitted with the caveat that any missing pages may be supplemented later under the Doctrine of Completeness); (b) Plaintiffs' Exhibits 1, 11, and 42–43 (admitted over the Defendants' objection to their relevance); and (c) UDF and UDF III's exhibits 109–111 (admitted over the Plaintiffs' objection to the legal conclusions contained therein).

After listening to the testimony of these witnesses and hearing oral argument of counsel, the Court took the matter under advisement.

The Court now makes the following findings of fact and conclusions of law pursuant to Federal Bankruptcy Rules 7052 and 9014. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

### III. FINDINGS OF FACT

1. Perry is an individual residing in the State of Texas and is the Debtor–in–Possession in the main case.

2. Southern Colony is a Texas limited partnership, with its principal place of business located in the State of Texas.

3. Hidden Lakes is a Texas limited partnership, with its principal place of business in the State of Texas.

4. Hidden Lakes GP is a Texas limited liability company and the general partner of Hidden Lakes.

5. UDF is a Nevada limited partnership doing business in the State of Texas.

6. UDF III is a Delaware limited partnership doing business in the State of Texas.

---

conference in this case soon after the order estimating the claims of UDF and UDF III is entered on the docket; and at this status conference, the Court will discuss scheduling a plan confirmation hearing with counsel for the Debtor and counsel for all other creditors and parties-in-interest.

7. UMTH is the general partner of UDF III.

8. Perry is a limited partner in Perry Properties.

9. Perry Properties is a limited partnership, a limited partner of Hidden Lakes, a member of Southern Colony, and a shareholder of Hidden Lakes GP, LLC (Hidden Lakes GP).

10. Hidden Lakes GP owns general partnership and limited partnership interests in Hidden Lakes.

11. On February, 21, 2007, Southern Colony executed a promissory note in the principal amount of $1,911,500.00 in favor of UDF III (the Original Southern Colony/UDF III Note) [Exhibit No. 3]. This loan was secured by a security agreement (the Southern Colony Security Agreement) [Exhibit No. 5] and a deed of trust (the Southern Colony Deed of Trust) [Exhibits No. 4 & 5] in favor of UDF III. On that same date, Perry, along with Perry Properties, executed an unsecured guaranty agreement (the Southern Colony Guaranty Agreement) [Exhibit No. 10] guaranteeing payment of the Original Southern Colony/UDF III Note. Finally, this loan was secured by a pledge agreement (the Southern Colony Pledge Agreement) [Exhibit No. 6] executed by Perry Properties pledging all right and title to any interest in Southern Colony to UDF III.

12. On February 21, 2007, Southern Colony closed on its purchase of a tract of real property—approximately 65.47 acres in Fort Bend County along FM 521 and Highway 6, south of Sienna Plantation (the Southern Colony Property). The Southern Colony Deed of Trust [Exhibits No. 4 & 5] grants a lien on this property to UDF III.

13. An appraisal done by Sam Boyd on April 3, 2007 [Exhibit No. 6] of a tract of real property located in League City, Galveston County, Texas (the Hidden Lakes Property) set forth that the fair market value of this property on March 20, 2007 was $5,290,000.00 "as-is," and $14,360,000.00 upon completion of development. This latter number represents $4,350,000.00 for the 65 foot lots, $6,210,000.00 for the 75 foot lots, and $3,800,000.00 for the present value of receivables due from a Municipal Utility District (MUD).

14. On May, 21, 2007, Hidden Lakes executed a promissory note in the principal amount of $1,931,250.00 in favor of UDF III (the Original Hidden Lakes/UDF III Note) [Exhibit No. 22]. This loan was accompanied by a security agreement (the Hidden Lakes/UDF III Security Agreement) [3] [Exhibit No. 23] granting UDF III a continuing security interest in all assets owned by both Hidden Lakes and Hidden Lakes GP. On that same date, Perry executed an unsecured guaranty agreement (the Hidden Lakes/UDF III Guaranty Agreement) [4]

---

3. Hereinafter, when the Hidden Lakes/UDF III Security Agreement and the Southern Colony Security Agreement are referred to together, they are defined as the UDF III Security Agreements.

4. Hereinafter, when the Hidden Lakes/UDF III Guaranty Agreement and the Southern Colony Guaranty Agreement are referred to together, they are defined as the UDF III Guaranty Agreements.

[Exhibit No. 25] along with Hidden Lakes GP, David Randolph, and Reggie Jacob, the other partners of Hidden Lakes, guaranteeing payment of the UDF III Loan. Finally, this loan was secured by a pledge agreement (the Hidden Lakes/ UDF III Pledge Agreement) [Exhibit No. 24] executed by Hidden Lakes GP, Perry Properties, David Randolph, and Reggie Jacob in favor of UDF III, each pledging all rights and privileges in, *inter alia,* any equity interests in Hidden Lakes.

15. On or about the same date (*i.e.,* May 21, 2007), Hidden Lakes also executed a promissory note in the original principal amount of $2,600,750.00 in favor of UDF (the Hidden Lakes/UDF Note) [Exhibit No. 28]. This loan was accompanied by a deed of trust (the UDF Deed of Trust) [Exhibit No. 29], executed by Hidden Lakes in favor of UDF, as well as a security agreement (the Hidden Lakes/ UDF Security Agreement) [Exhibit No. 29] granting UDF a continuing security interest in all assets owned by Hidden Lakes and Hidden Lakes Investments GP. Perry, David Randolph, and Reggie Jacob also executed a guaranty agreement (the Hidden Lakes/UDF Guaranty Agreement)[5] guaranteeing payment of the UDF loan. Finally, this loan was secured by a pledge agreement (the Hidden Lakes/UDF Pledge Agreement) [Exhibit No. 31] executed by Hid-

den Lakes GP, Perry Properties, David Randolph, and Reggie Jacob in favor of UDF, each pledging all rights and privileges in, *inter alia,* any equity interests in Hidden Lakes. UDF and UDF III executed a subordination agreement [Exhibit No. 23] with Hidden Lakes in which UDF subordinated its loan and security rights to UDF III.

16. On or about May 22, 2007, Hidden Lakes executed a promissory note to RBC Centura Bank (RBC) in the original principal amount of $9,986,762.00 (the RBC Note). The Hidden Lakes/UDF Note [Exhibit No. 28] and the Original Hidden Lakes/UDF III Note [Exhibit No. 22] are subordinate to the RBC Note.

17. On May 22, 2007, Hidden Lakes closed on its purchase of the Hidden Lakes Property. The UDF Deed of Trust [Exhibit No. 29] grants a lien on this property in favor of UDF.

18. After closing on the purchase of the Hidden Lakes Property, Hidden Lakes began development of this property.

19. On August 20, 2007, the Original Southern Colony/UDF III Note was modified to reflect an increased principal amount of $2,998,845.00 (the Amended Southern Colony/UDF III Note)[6] [Exhibit No. 28]. The purpose of this amendment was to continue UDF III's forbearance towards the interest accruing monthly, and to in-

---

5. Hereinafter, when the Hidden Lakes/UDF Guaranty Agreement is referred to together with the UDF III Guaranty Agreements, they are defined as a group as the Guaranty Agreements.

6. Hereinafter, when the Amended Southern Colony/UDF III Note and the Original Southern Colony/UDF III Note are referred to together, they are defined as the Southern Colony/UDF III Notes.

crease the interest reserve under the note from $40,000.00 to $1,040,000.00 in order to reflect UDF Ill's continued forbearance.

20. On April 11, 2008, Perry filed for protection under Chapter 11 of the Bankruptcy Code in this Court. On that same date, Perry Properties ceased all operations.

21. On or about May 2008, UDF hired Iselt to oversee efforts to bring the Hidden Lakes Property into compliance with various legal requirements (by finishing, *inter alia,* the dry utilities) so that permits necessary to the beginning of home construction could be obtained. Iselt acted as a go—between for UDF and the various contractors who were working on the Hidden Lakes Property.

22. In June of 2008, due to a shortfall in payments on the RBC Note, UDF III funded a Certificate of Deposit in the amount of $1,720,320.00, pledged it to RBC, and allowed RBC to sweep it and apply the proceeds to Hidden Lakes' obligation under the RBC Note. This transaction between UDF III and RBC was essentially a payment by UDF III on behalf of Hidden Lakes. The Original Hidden Lakes/UDF III Note [Exhibit No. 22] was subsequently or concurrently amended in order to increase the face value of this Note to $3,651,570.00 to reflect this payment on Hidden Lakes' behalf. This amendment is memorialized by an amended promissory note (the Amended Hidden Lakes/UDF III Note) [7] [Exhibit No. 40].[8] On June 25, 2008, UDF III filed a "Motion for Order Approving Modification of Pre–Petition Guaranty Made by Debtor to United Development Funding III, L.P." [Main Case Docket No. 95.] [9] On July 23, 2008 the Court granted this motion pursuant to "Order Granting Motion for Approval" [Main Case Docket No. 139].

23. On August 27, 2008, UDF and UDF III filed four Proofs of Claim arising from Perry's guarantees of the Notes. UDF III filed Proof of Claim number 43 [Exhibit No. 100] in the amount of $3,619,902.00. Of this total amount, $1,636,649.00 represents UDF Ill's claim as of April 11, 2008, the date Perry filed his petition for Chapter 11, and $1,983,253.00 represents the claim arising from the post-petition modification. On August 27, 2008, UDF filed Proof of Claim number 44 [Exhibit No. 101] in the amount of

**7.** Hereinafter, when the Amended Hidden Lakes/UDF III Note and the Original Hidden Lakes/UDF III Note are referred to together, they are defined as the Hidden Lakes/UDF III Notes.

**8.** Hereinafter, when the Hidden Lakes/UDF III Notes (*i.e.,* the Original Hidden Lakes/UDF III Note and the Amended Hidden Lakes/UDF III Note) are referred to together with the Southern Colony/UDF III Notes (*i.e.,* the Original Southern Colony/UDF III Note and the Amended Southern Colony/UDF III Note), they are defined as a group as the UDF III Notes. When these UDF III Notes are referred to together with the Hidden Lakes/UDF Note (in other words when all promissory notes at issue in the suit at bar are referred to as a group), they are all defined together as the Notes.

**9.** This motion for modification requested approval of an increase to the amount guaranteed by Perry under the Hidden Lakes/UDF III Guaranty Agreement [Exhibit No. 25] by $1,720,320.000, mirroring the increase in the amount owed under the Hidden Lakes/UDF III Notes.

"at least" $1,891,528.35. On August 29, 2008, UDF III filed Proof of Claim number 45 [Exhibit No. 102] in the amount of $3,619,902.00, where $1,636,649.00 of this amount represents UDF III's claim as of April 11, 2008, the date Perry filed his petition for Chapter 11, and where $1,983,253.00 of this amount represents the claim arising from the post-petition modification. On August 29, 2008, UDF III filed Proof of Claim number 46 [Exhibit No. 103] in the amount of $2,538,945.03, where $2,177,260.03 of this amount represents UDF III's claim as of April 11, 2008, the date Perry filed his petition for Chapter 11, and where $361,685.00 of this amount apparently represents a claim for post-petition interest and fees. As explained in greater detail in section V(B)(viii) of this opinion, *infra*, the Court finds Proof of Claim 45 to be duplicative of Proof of Claim 43, and disallows Proof of Claim 45 in its entirety.

24. On February 9, 2009, a notice of the substitute trustee's sale of the Hidden Lake Property was posted and sent. On March 3, 2009, the substitute trustee sold the Hidden Lakes Property at a foreclosure sale in Galveston County, Texas to CTMGT for $2,100,000.00. At the time of purchase, the Hidden Lakes Property was subject to a lien securing a debt to RBC in the amount of approximately $6,700,000.00. CTMGT purchased the Hidden Lakes Property by borrowing funds from UDF III.

25. On March 16, 2009, Ernest Randall (Randall), an owner of land adjoining the Hidden Lakes Property, filed a Fourth Amended Petition and Application for Temporary Restraining Order and Temporary Injunction in State District Court in Galveston County concerning drainage on the Hidden Lakes Property and water levels of an artificial lake that is contained by the Hidden Lakes Property and Randall's property (the Hidden Lakes Lawsuit). CTMGT was named as a defendant in the lawsuit along with BG Group, LLC d/b/a Perry Properties[10] and Hidden Lakes.

26. On July 23, 2009, the Plaintiffs filed the Complaint [Docket No. 1] naming UDF and UDF III as defendants. The Complaint requests the disallowance of the following Proofs of Claim, each of which arose from Perry's guarantees of the previously described loans made by UDF and UDF III:(1) Proof of Claim number 43 by UDF III; (2) Proof of Claim number 44 by UDF; (3) Proof of Claim 45 by UDF III; and (4) Proof of Claim 46 by UDF III. In addition to the disallowance of these Proofs of claim, the complaint seeks: (1) actual damages pursuant to Tex. Fin.Code §§ 305.003 and 305.004 in favor of Hidden Lakes and Southern Colony; (2) equitable subordination of any of the above referenced claims that this Court may allow; and (3) court costs and

---

**10.** BG Group, LLC's listing as a defendant in Exhibits 112–116 are the only references to this legal entity in the record. The Court has been provided no other information on BG Group, LLC. However, the Court is very familiar with Perry Properties, and because BG Group, LLC does business as Perry Properties, the Court will continue to refer to this entity solely as Perry Properties.

reasonable attorneys' fees in favor of Hidden Lakes and Southern Colony.

27. As noted above, a lengthy trial, with substantial time for discovery, will be required to adjudicate the Complaint. Accordingly, in order to hold a timely confirmation hearing, the Court decided to estimate these claims and therefore scheduled the Hearing. The Hearing was, in effect, a mini-trial of the issues in dispute.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

■■■ The Court has jurisdiction over this adversary proceeding, and this claim estimation matter,[11] pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute about estimation of claims is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir.1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06–3556, 2006 WL 3805670, at *19 (Bankr. S.D.Tex. Dec. 22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### B. Issues Relating to the Estimation of the Four Proofs of Claim

#### i. The Court's approach to estimating UDF and UDF III's claims

■■■ In a claims estimation proceeding pursuant to 11 U.S.C. § 502(c), the Court has much latitude in the method it chooses to evaluate a claim. *See In re Brints Cotton Mktg., Inc.*, 737 F.2d at 1340–41; *Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 135–36 (3d Cir.1982). Generally, the Court may estimate claims by "whatever method is best suited to the particular contingencies at issue," so long as the underlying purposes of the Code are not contravened. *Bittner*, 691 F.2d at 135–36; *see also In re Brints Cotton Mktg., Inc.*, 737 F.2d at 1340–41. The Court is required evaluate claims pursuant to the legal rules which may govern the ultimate value of the claim. *In re Brints Cotton Mktg., Inc.*, 737 F.2d at 1340–41; *Bittner*, 691 F.2d at 135–36 ("For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law."). The Court is not otherwise limited in its approach to the estimation process.

■■■ In the current suit, the Court employs a five-step process to estimate the UDF and UDF III's claims. First, the Court estimates the claims of UDF and UDF III by evaluating the various issues and record currently before the Court. Second, the Court then estimates the like-

---

**11.** The Court has the legal authority to estimate these claims under 11 U.S.C. § 502(c), which provides that contingent or unliquidated claims which would unduly delay the administration of the case shall be estimated by the Court. 11 U.S.C. § 502(c) (2006) Moreover, the Court has an *affirmative duty* to

estimate such claims in order to facilitate the administration of the case. *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1340–41 (5th Cir.1984); *In re Towner Petroleum*, 48 B.R. at 187 *citing Nova Real Estate*, 23 B.R. 62 (Bankr.Va.1982).

lihood of this Court coming to a different conclusion in a full trial on these same issues. It estimates this probability by taking into consideration the relative strength of the various arguments made by the parties, how complete the record is in regard to the relevant facts, as well as the nature of the analysis required to reach a given conclusion (*i.e.*, the more mechanical and objective the analysis for a particular finding or conclusion, the lower the probability of this Court coming to a different conclusion). Based on these considerations, the Court then assigns a numerical percentage value to the probability of coming to this different conclusion (*e.g.*, 20%). Third, the Court estimates the likely effect of this different result on the Defendants' claims (*i.e.*, is the effect is to eliminate the Defendants' claim entirely, or is the effect to reduce the Defendants' claim by, say, $500,000.00?). Fourth, the Court then multiplies the percentage chance of reaching the different result in a full trial on the merits by the estimated effect of the different result on the Defendants' claims. Fifth, the Court then discounts the Defendants' claims by this amount.

For example, if the Court estimates a given claim to be $1,000,000.00 based on the applicable rules of law and the record before it, and then estimates a 20% likelihood of reaching a different result in a full trial on the merits, and, further, estimates that reaching this different result would reduce the Defendants' claim by $1,000,000.00, the Court would then discount the estimated claim by 20% × $1,000,000.00, or $200,000.00. The final estimated claim in this example would be $800,000.00 (*i.e.*, $1,000,000.00—$200,000.00). Alternatively, if the Court estimated that the consequence of reaching this different result would instead reduce the Defendants' claim by only $500,000.00, the Court would then discount this claim by 20% × $500,000.00, or $100,000.00. The final estimated claim in this example would therefore be $900,000.00 (*i.e.*, $1,000,000.00—$100,000.00).

The Court believes this approach is best suited for this particular dispute because many of the issues raised in this claims estimation proceeding may be analyzed largely, or in their entirety, on the basis of the language of the various agreements pertaining to the loan transactions between the parties, or various other documents on the record memorializing the transaction, (*e.g.*, the Loan Histories [Exhibits No. 18, 27, & 36] or the Settlement Statements [Exhibits No. 17 & 35]). As a result, the record is reasonably complete for these issues, providing a solid foundation for the Court to evaluate the applicable rules of law and the relative certainty of its own conclusions—*i.e.*, the probability of reaching a different result in a full trial. Discounting the claims by the probability of reaching a different result in a full trial leads to a more equitable estimation proceeding because the discount acts as a check against possible errors resulting from the mini-trial of November 19–20, 2009. Stated differently, discounting claims in this manner helps to ensure that a party will not unduly benefit from the special and abbreviated nature of a claims estimation proceeding.

ii. *Issues Relating to the Estimation of the Proofs of Claim Submitted by UDF III.*

In the Complaint [Docket No. 1], the Plaintiffs request the disallowance of Proofs of Claim number 43 [12], 45, and 46,

12. The Plaintiffs' initial complaint identifies UDF as filing Proof of Claim number 43. It

filed by UDF III, and arising from Perry's guaranty of the UDF III Notes, due to any one of the following legal grounds: (1) errors in the Proofs of Claim; (2) usury; (3) equitable subordination; (4) right to credits as a result of the foreclosure sale of the Hidden Lakes Property; (5) unliquidated claims; (6) ability of the borrower to pay the obligation; or (7) Proof of Claim 45 is duplicative of Proof of Claim 43.

UDF III denies these allegations and raises the following legal grounds in its defense: (1) the Plaintiffs are equitably estopped from asserting a claim of usury; (2) Perry, as guarantor, lacks standing to assert a claim of usury or obtain setoff from usury penalties; and (3) the savings clauses in each of the UDF III Notes protect UDF III from contracting for, charging, or receiving usurious interest. UDF III argues that, for purposes of estimation, this Court should hold that the amount of its claims should be the amounts set forth in its Proofs of Claim. Stated differently, UDF III argues that there should be no discount of these amounts. Hence, UDF III asserts that its estimated total claim should be $9,778,749.03 (which is the sum of the pre and post-petition claims made by UDF III under its Proofs of Claim 43, 45, and 46—*i.e.*, $3,619,902.00 + $3,619,902.00 + $2,538,945.03 = $9,778,749.03).

*iii. Issues Relating to the Estimation of the Proofs of Claim Submitted by UDF.*

In the Complaint [Docket No. 1], the Plaintiffs request the disallowance of Proof of Claim number 44 filed by UDF, arising from Perry's guaranty of the Hidden Lakes/UDF Note, due to any one of the following legal grounds: (1) errors in the

Proof of Claim; (2) usury; (3) actions to recover deficiency are barred by Nevada law; (4) equitable subordination; (5) right to credits as a result of the foreclosure sale of the Hidden Lakes Property; or (6) ability of the borrower to pay the obligation.

UDF denies these allegations and raises the following legal grounds in its defense: (1) the Plaintiffs are equitably estopped from asserting a claim of usury; (2) Perry, as guarantor, lacks standing to assert a claim of usury or obtain setoff from usury penalties; and (3) the savings clauses in the Hidden Lakes/UDF Note protect UDF from contracting for, charging, or receiving usurious interest. UDF argues that, for purposes of estimation, this Court should hold that the amount of its claim should be the amount set forth in Proof of Claim 44. Stated differently, UDF argues that there should be no discount of this amount. Hence, UDF asserts that its estimated claim should be "at least" $1,891,528.35.

## C. Conclusions of Law pertaining to the Loans made by UDF III

*i. What is the Proper Aggregate Amount of the Proofs of Claim?*

The first step in the analysis is to determine the initial proper amount of UDF III's Proofs of Claim before any reduction due to the legal grounds raised by the Plaintiffs. Three issues must be addressed: (1) whether UDF III is entitled to post-petition interest and costs; (2) the amount of principal actually advanced on the loans; and (3) the amount of interest due on the amount of principal actually advanced.[13] Texas law applies to the UDF III Notes pursuant to the express lan-

---

was clarified at the Hearing that Proof of Claim 43 was filed on behalf of UDF III.

13. These same issues are addressed with respect to the Hidden Lakes/UDF Note below, in Section D(i) of the Conclusions of Law.

guage of these Notes. The Court addresses each issue in turn.

*(1) Is UDF III entitled to post-petition interest and costs on the Hidden Lakes/UDF III Notes?*

The Bankruptcy Code [14] is very clear on when creditors are entitled to post-petition interest and costs. Section 506(b) provides that "to the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable costs or charges...." 11 U.S.C. § 506(b) (2006). The definition of a "secured claim" is provided in Section 506(a)(1), which states that "An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...." *Id.* § 506(a)(1). Section 506(a)(1) goes on to provide that an allowed claim "is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such secured claim." *Id.* Finally, and importantly for the analysis here, Section 502(b) provides that a creditor is not entitled to "unmatured interest" on an unsecured claim. *Id.* § 502(b)(2). Thus, the initial inquiry is to determine the value of the estate's interest in the collateral securing the Hidden Lakes/UDF III Notes in order to determine the amount, if any, of UDF III's secured claim. If the value of the estate's interest in the collateral is greater than the amount of UDF III's claim, then UDF HI is entitled to post-petition interest and costs up to the point that total principal, plus interest and costs,

is equal to the value of the estate's interest in the collateral. If the value of the estate's interest in the collateral is less than the amount of UDF III's claim, then some portion of UDF III's claim will be an unsecured claim, and UDF III will not be entitled to post-petition interest and costs.

Given the record before this Court, the value of the estate's interest in the collateral should be valued at zero dollars, and, therefore, the Court finds that UDF III is not entitled to post-petition interest and costs. As noted above, in order to be counted towards a secured claim, collateral securing a debt must be property of the bankruptcy estate—*i.e.*, Perry, as the Debtor–in–Possession, must have had an interest in the collateral at the time of his Chapter 11 filing. Here, Perry had no interest in any of the collateral securing the Hidden Lakes/UDF III Notes [Exhibits No. 22 & 40]. Therefore, the value of his estate's interest in the collateral must be placed at zero dollars. As a result, UDF III has only an unsecured claim and it is not entitled to receive post-petition interest or costs relating to the Hidden Lakes/UDF III Notes [Exhibits No. 22 & 40].

*(2) Is UDF III entitled to post-petition interest and costs on the Southern Colony/UDF III Notes?*

As noted in the preceding analysis, the Court may only consider collateral securing the Southern Colony/UDF III Notes in Perry's bankruptcy estate in determining whether UDF III has a secured claim under the Southern Colony/UDF III Notes [Exhibits No. 3 & 14]. And, just as with the Hidden Lakes/UDF III Notes,

**14.** Any reference hereinafter to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (*i.e.* § ) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a "Rule" or "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

the Southern Colony/UDF III Notes are not secured by any property in Perry's bankruptcy estate. As such, UDF III has no secured claim and is not entitled to any post-petition interest or costs relating to the Southern Colony/UDF HI Notes [Exhibits No. 3 & 14].

*(3) What is the dollar amount of principal actually advanced by UDF III under the Hidden Lakes/UDF III Notes?*

• *(a) The Original Hidden Lakes/UDF III Note*

Neither party contends that the full principal face value of the Original Hidden Lakes Note was advanced, but there is disagreement over the amount of principal that actually was advanced. The Plaintiffs assert that the face principal value of the of the Original Hidden Lakes/UDF III Note was reduced by an "interest reserve" in the amount of $450,000.00; a one-half share of a "commitment fee" purportedly paid to UMTH in the amount of $37,875.00 (the full fee being in the amount of $75,750.00); a "2% consulting fee" in the amount of $28,500.00 to Winchester Equities, LLC; a "commitment fee" to UDF III in the amount of $56,250.00; and a "second lien fee" purportedly paid to UDF III in the amount of $6,500.00. All of these reductions appear to be taken direct-ly from items on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. The Plaintiffs assert that these fees reduce the principal actually advanced on the Original Hidden Lakes/ UDF III Note from a face value of $1,931,250.00 down to $1,332,625.00.

■■ Because the Plaintiffs argue that UDF III contracted for, charged, or received usurious interest under the UDF III Notes, and Texas usury law may require a recharacterization of certain fees as interest, these fees require two separate characterizations by the Court:[15] first, the Court must characterize these fees under Texas contract and applicable non-usury finance law in order to determine UDF III's threshold claim under the contract alone; and second, the Court must determine whether these fees should properly be characterized as interest under usury law in determining whether the interest contracted for, charged, or received under the UDF III Notes was in excess of the legal limit. In this section, the Court characterizes the fees under Texas contract law in order to determine the amount of principal actually advanced. The fees are characterized for the usury analysis below, in section C(ii) of the Conclusions of Law.

---

15. *See Perry v. Stewart Title Co.,* 756 F.2d 1197, 1206 (5th Cir.1985) ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious.*") citing *First State Bank of Bedford v. Miller,* 563 S.W.2d 572, 575 (Tex.1978) ("'In a cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury.'")* quoting *Tanner Dev.* *Co. v. Ferguson,* 561 S.W.2d 777, 782–83 (Tex. 1977). Even if the Court finds that usurious interest is contracted for, charged, or received, the Notes remain valid and enforceable by UDF and UDF III, "provided allowance is made for the penalty." *Vordenbaum v. Rubin,* 611 S.W.2d 463, 465 (Tex.Civ.App.Dallas 1980) *citing Wall v. E. Texas Teachers Credit Union,* 526 S.W.2d 148, 151–52 (Tex.Civ.App.-Texarkana 1975), *rev'd on other grounds,* 533 S.W.2d 918 (Tex.1976). Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin.Code Ann. § 305.001(a-l)(Vernon 2009).

There is a threshold issue concerning the Plaintiffs' assertions that the Court must address before proceeding with its analysis of the amount of principal actually advanced under the Hidden Lakes/UDF III Notes. Assuming that each of the fees or interest reserve is an item properly characterized as *not* being principal actually advanced, the Court cannot recreate the figure of $1,332,625.00 advanced by the Plaintiffs, as shown below:

| | |
|---|---|
| $ 1,931,250.00 | (face principal value) |
| − $ 450,000.00 | (interest reserve) |
| − $ 37,875.00 | (½ share of commitment fee to UMTH) |
| − $ 28,500.00 | (consulting fee to Winchester Equities) |
| − $ 56,250.00 | (commitment fee to UDF III) |
| − $ 6,500.00 | (second lien fee to UDF III) |
| $ 1,352,125.00 | (principal actually advanced) |

Because $1,352,125.00 is the lowest amount of actual principal advanced that the Court can calculate assuming all of the Plaintiffs' allegations regarding the fees at issue are true, the Court will assume that $1,352,125.00 is the amount that the Plaintiffs concede was principal actually advanced for the purposes of the analysis.

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full amounts. In so doing, the Defendants do not specify an amount advanced as principal, and instead appear to rely on the Original Hidden Lakes/UDF III Note [Exhibit No. 22] and the Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] for the amount of principal actually advanced under this Note. The Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in the amount of $1,425,000.00, which is the amount listed as the "Commitment" in the Original Hidden Lakes/UDF III Note [Exhibit No. 22] (the Commitment is expressly characterized as principal in this Note).

The loan history documents do not indicate how this number was derived, but the Court will assume that this number represents the full principal face value of $1,931,250.00, reduced by the interest reserve of $450,000.00 and the commitment fee to UDF III of $56,250.00, which results the amount of $1,425,000.00 stated on the loan history.

By implication, the Court assumes that both parties agree that the interest reserve of $450,000.00 does not represent principal actually advanced (pursuant to the uncontested express language of this Note). The next step in the analysis is to characterize the four items which are in dispute: (1) the commitment fee to UDF HI of $56,250.00; (2) the 2% consulting fee of $28,500.00 to Winchester Equities, LLC; (3) the second lien fee allegedly paid to UDF III in the amount of $6,500.00; and (4) the one-half share of a commitment fee paid to UMTH in the amount of $37,875.00. These items are addressed in turn.

■■■ Under Texas contract law, "[w]hen construing a contract, the court's primary concern is to give effect to written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994). A contract "is to be construed in accordance with its plain language." *Gen. Am. Indem. Co. v. Pepper*, 161 Tex. 263, 339 S.W.2d 660, 661 (1960). Where the words in a contract are "clear and unambiguous," the rules of construction are not to be applied. *Id.* The unambiguous words of a contract are deemed to "express the intention of the parties, because objective, not subjective, intent controls." *Derr Constr. Co. v. City of Houston*, 846 S.W.2d 854, 861 (Tex.App. Houston [14th Dist.] 1992). In determining the meaning of the words of a contract, the Court is "bound to read all

parts of a contract together to ascertain the agreement of the parties." *Forbau*, 876 S.W.2d at 133. "The contract must be considered as a whole" and "[m]oreover, each part of the contract should be given effect." *Id.* Accordingly, the Court will look first to the language of the entirety of the Hidden Lakes/UDF III Notes to determine how the parties intended the fees to be characterized. Only if the terms of the Hidden Lakes/UDF III Notes are ambiguous as to how a fee should be characterized will the Court look to the rules of construction or extrinsic evidence to classify the fees at issue.

■ The first item to be characterized is the commitment fee to UDF III in the amount of $56,250.00 (the UDF III Commitment Fee). Under the Original Hidden Lakes/UDF III Note [Exhibit No. 22], a commitment fee in the amount of $56,250.00 is contemplated at Section 2(c)—"Loan Expenses; Fees Commitment Fee." This paragraph clearly characterizes the UDF III Commitment Fee as principal. In plain language, it states that "[b]orrower agrees that such amount *shall automatically constitute principal* outstanding hereunder and caused [*sic*] *a corresponding increase in the aggregate outstanding amount of Borrower's obligations hereunder.*" Accordingly, the Court finds that the UDF III Commitment Fee is properly characterized as principal actually advanced.

■ The second item to be characterized is the 2% consulting fee in the amount of $28,500.00 to Winchester Equities, LLC. This fee is item 805 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to itemize inspections done at the request of the lender, so the Court will assume this fee represents a payment to an inspector of the Hidden Lakes Property. As with the commitment fee above, the Original Hidden Lakes/UDF III Note [Exhibit No. 22] clearly contemplates such fees. The plain language of Section 2(a) states that "Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all expenditures . . . in connection with any of the following: (i) . . . the closing . . . of any loan or creditor facility represented by or secured by the Loan Documents, including . . . inspection services and disbursements." Unlike the language in Section 2(c) of the Original Hidden Lakes/UDF III Note [Exhibit No. 22] (concerning the commitment fee), this paragraph does not specifically designate such expenses as principal. But Section 2(f)—"Loan Expenses;—Fees Advance of Certain Fees"—clearly contemplates the payment of such fees as an advance out of the Commitment of $1,425,000.00. Therefore, the Court finds that the 2% consulting fee of $28,500.00 to Winchester Equities, LLC constitutes principal actually advanced.

The third item to be characterized is the second lien fee paid to UDF III in the amount of $6,500.00. The second lien fee is listed as item 811 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] as "2nd Lien Fee to United Development Funding *III*," (*emphasis added*). However, for reasons that will be discussed below, the Court believes that this entry is incorrect and that the second lien fee was actually paid, or in any case should have been paid, to UDF. If this item was actually rightfully paid to UDF III, it is likely that, as with the 2% consulting fee of $28,500.00, the plain language of Original Hidden Lakes/ UDF HI Note [Exhibit No. 22] Section 2(a) encompasses this second lien fee. Section 2(a) states that the "[b]orrower will pay all reasonable costs and expenses and reimburse Lender for any and all ex-

penditures ... in connection with any of the following: ... (ii) Lender's creating, perfecting, and realizing upon Lender's security interest in, and the Liens on, the Pledged Collateral or any other collateral granted or pledged as security for this loan." Accordingly, Section 2(f)—"Loan Expenses; Fees—Advance of Certain Fees"—clearly contemplates the payment of such fees as an advance out of the Commitment of $1,425,000.00, and the amount of the fee will be characterized as principal for that reason if UDF III was the proper payee.

However, the Court believes that there is ample evidence that the second lien fee was actually paid, or should have been paid, to UDF (and not to UDF III). First and foremost, UDF is described as the intended and actual lienholder on the Hidden Lakes Property in almost every document pertaining to the loan between Hidden Lakes and UDF, whereas UDF III is never mentioned in connection with the lien except for the entry on item 811 of the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. For example, the Loan Commitment Letter from UDF to Hidden Lakes [Exhibit No. 20] sets forth that such a lien will be created in favor of UDF ("The Loan will be secured by (i) a deed of trust creating a lien against the Property, second in priority only to a senior lender providing financing for the acquisition of the Property ...") whereas the Loan Commitment Letter from UDF III to Hidden Lakes [Exhibit No. 21] for the loan between Hidden Lakes and UDF III does not. Moreover, the Original Hidden Lakes/UDF Note [Exhibit No. 28] provides that it will be secured by a "Deed of Trust" giving UDF "a security interest in and a Lien on the

Property." In contrast, the Original Hidden Lakes/UDF III Note contemplates no such deed of trust or lien. The UDF Deed of Trust, itself, which is the only evidence on the record showing a lien on the Hidden Lakes Property held by either UDF or UDF III, states that it "is made to secure and enforce the payment of ... that certain Secured Promissory Note ... payable to the order of [UDF]." Moreover, the UDF Deed of Trust makes no mention of UDF III, nor is there a corresponding deed of trust securing the loan between Hidden Lakes and UDF III. The Assignment of Promissory Notes, Deed of Trust and Loan Documents [Exhibit No. 32] assigns UDF's rights, title and interest in the Deed of Trust relating to Hidden Lakes. There is no corresponding assignment document in the record assigning a lien on the Hidden Lakes Property held by UDF III. There *is*, however, an Assignment of Deed of Trust, Security Agreement and Fixture Filing and Loan Documents by UDF III [Exhibit No. 15] which assigns UDF III's rights, title, and interest in the Southern Colony Deed of Trust. These circumstances reflect a pattern in the loan transactions where UDF and UDF III assigned their rights in the liens on real property, making the absence of a Hidden Lakes/UDF III assignment more conspicuous.

The loan documents also tend to identify UDF as the *second* lienholder on the Hidden Lakes Property, occupying a subordinate position to the lien held by RBC. The Term Sheet by United Development Funding, LP and United Development Funding III, LP to Perry Properties and Hidden Lakes provides that a *second* lien deed of trust will serve as collateral for the loan.[16] The Loan Commitment Letter

---

**16.** The term sheet pertains to the loans to Hidden Lakes from both UDF and UDF III. The Court believes that there are enough oth-

er documents indicating that the second lien deed of trust contemplated in the term sheet applies only to UDF and not UDF III, or

from United Development Funding to Southern Colony [Exhibit No. 20] for the loan between Hidden Lakes and UDF provides that the deed of trust to be provided to UDF is "second in priority only to a senior lender providing financing for the acquisition of the Property." The Deed of Trust [Exhibit No. 29] contains a Hidden Lakes warranty that it will defend title to the Hidden Lakes Property against all claims except, inter alia, "encumbrances associated with the loan agreement ... between Grantor and [RBC]." The Subordination Agreement between UDF and RBC [Exhibit No. 33] provides that UDF's liens under the Deed of Trust "are and shall continue to be expressly subject and subordinate to [RBC]'s senior loan." Accordingly, under all of these circumstances, the Court finds it reasonable to assume that the second lien fee identified as item 811 of the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] was properly payable to UDF, not UDF III.

Accepting this assumption as true means that, more than likely, one of two things took place: either (1) the second lien fee was paid to UDF, as the second lienholder, and the entry for item 811 the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] erroneously identifies UDF III as the payee; or, (2) UDF III actually received the second lien fee as stated in the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] by mistake or according to a transaction structure that is not apparent in the record. Because there is no evidence in the record currently before the Court that indicates which of these possibilities is the case, the Court employs Occam's Razor [17] as a guideline in finding that the simpler explanation for this seemingly contradictory entry on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is that the second lien fee was, in reality, paid to UDF, and the identification of UDF III as the recipient on the Settlement Statement [Exhibit No. 35] was simply a scrivener's error. With no supporting evidence one way or the other, it is far easier for the Court to believe that a typographical error was entered on a document misidentifying a party, than that a sum of $6,500.00 was paid to the wrong party, or that a transaction took place in which a payment to the holder of the second lien was actually intended to go to a party other than the actual holder of the second lien. For these reasons, the Court finds that the Plaintiffs improperly removed the second lien fee of $6,500.00 from the amount of principal actually advanced by UDF III under the Original Hidden Lakes/UDF III Note [Exhibit No. 22], because this payment was not actually made to UDF III and is in no way pertinent to the loan transaction between Hidden Lakes and UDF III.

The fourth and final item to be characterized is the one-half share of a commitment fee paid to UMTH in the amount of $37,875.00. The Court believes that the Plaintiffs have improperly ascribed this fee to UDF III as well. For instance, the Original Hidden Lakes/UDF III Note [Exhibit No. 22] makes no mention of such a

---

alternatively, that sometime after the term sheet was drafted, the parties agreed that the second lien deed of trust would be held solely by UDF.

17. "When competing hypotheses are equal in other respects, the principle recommends selection of the hypothesis that introduces the fewest assumptions and postulates the fewest entities while still sufficiently answering the question." http://en.wikipedia.org/wiki/Occam.s_Razor (Jan. 29, 2010); see, e.g., Stephen Hawking, A Brief History of Time 55 (1990).

commitment fee. Whereas, the Hidden Lakes/UDF Note [Exhibit No. 28] specifically contemplates a commitment fee in the amount of $75,750.00 at Section 2(c)—"Loan Expenses; Fees—Commitment Fee." $75,750.00 is the exact amount of the fee which the Plaintiffs argue should be charged, in equal parts, to UDF and UDF III. Furthermore, the amount listed as paid to UMTH in item 807 of Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is also listed as the UDF commitment fee at item 104. Thus, the Court finds that the Plaintiffs have erred in asserting that the principal actually advanced under the Original Hidden Lakes/UDF III Note should be a one-half share of the commitment fee paid to UMTH. This commitment fee is not a part of the loan transaction between UDF III and Hidden Lakes, and therefore has no impact on the Court's determination of the amount of principal actually advanced.

To reach the final amount of principal advanced under the Original Hidden Lakes UDF III Note [Exhibit No. 22], the Court aggregates the various amounts of principal found to be actually advanced under the Original Hidden Lakes/UDF III Note:

1. The Commitment under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] in the amount of $1,425,000.00. The Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in an identical amount. As noted in the analysis above, the 2% consulting fee of $28,500.00 to Winchester Equities, LLC, and the second lien fee to UDF III (if the fee was, in actuality, paid to UDF III) both make up part of the Commitment pursuant to the Original Hidden Lakes/UDF III Note [Exhibit No. 22]. As these fees are properly characterized as principal, neither necessitates a re-duction in the amount of the Commitment for the purposes of the Court's determination of the principal actually advanced under the Original Hidden Lakes/UDF III Note.

2. The UDF III Commitment Fee in the amount of $56,250.00. Pursuant to the Original Hidden Lakes/UDF III Note [Exhibit No. 22], Section 2(c)—"Loan Expenses; Fees—Commitment Fee," the UDF III Commitment Fee is an additional component of principal actually advanced under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] on May 22, 2007, and separate from the Commitment.

Adding the Commitment (*i.e.*, $1,425,000.00) and the Commitment Fee (*i.e.*, $56,250.00) together, the calculated amount of principal actually advanced increases to $1,481,250.00 (*i.e.*, $1,425,000.00 (including the $28,500.00 2% consulting fee to Winchester Equities, LLC) + 56,250.00 = $1,481,250.00).

● *(b) The Amended Hidden Lakes/UDF III Note*

The parties agree on the amount of principal advanced under the Amended Hidden Lakes/UDF III Note [Exhibit No. 40]. The facts surrounding the making of this amendment are summarized as follows: In June of 2008, due to a shortfall in payments on the RBC Note, UDF III funded a Certificate of Deposit in the amount of $1,720,320.00, pledged the Certificate of Deposit to RBC, and allowed RBC to sweep the Certificate of Deposit and apply the proceeds to Hidden Lakes' obligation under the RBC Note. [Finding of Fact No. 22.] The Original Hidden Lakes/UDF III Note [Exhibit No. 22] was modified in order to increase the principal amount to $3,651,570.00 to reflect this transaction, which was essentially a payment on behalf

of UDF m. [Finding of Fact No. 22.] On June 25, 2008, UDF III filed a motion for "Order Approving Modification of Pre–Petition Guaranty Made by Debtor to United Development Funding III, L.P." [Main Case Docket No. 95.][18] [Finding of Fact No. 22.] On July 23, 2008, the Court granted this motion on July 23rd, 2008 pursuant to "Order Granting Motion for Approval" [Main Case Docket No. 139.] [Finding of Fact No. 22.] This principal amount was used to provide RBC with a pledged certificate of deposit, which UDF III then allowed RBC to sweep in satisfaction of the shortfall. [Finding of Fact No. 22.]

The face of the Amended Hidden Lakes/UDF III Note [Exhibit No. 40] states that the modification is to increase the principal amount of the Original Hidden Lakes/UDF III Note [Exhibit No. 22], by $1,720,320.00, the amount of the shortfall on the RBC Note at the time the amendment was made. Neither party contends that this amount was not actually advanced. Adding the amount of the additional funds actually advanced under the Amended Hidden Lakes/UDF III Note [Exhibit No. 40] (*i.e.,* $1,720,320.00) to the amount of principal advanced under the Original Hidden Lakes/UDF III Note [Exhibit No. 22] (i.e., $1,481,250.00) **brings the total principal actually advanced under the Hidden Lakes/UDF III Notes to $3,201,570.00.**

*(4) What is the dollar amount of principal actually advanced by UDF III under the Southern Colony/UDF III Notes?*

●*(a) The Original Southern Colony/UDF III Note*

Neither party contends that the full face principal value of the Original Southern Colony/UDF III Note [Exhibit No. 3] was advanced, but there is disagreement over the amount actually advanced. The Plaintiffs assert that the principal face value of the Original Southern Colony/UDF III Note [Exhibit No. 3] was reduced by the following amounts: (a) an "interest reserve" in the amount of $40,000.00; (b) $100,000.00 in "option payments"; (c) a $150,000 "extension fee"; and (d) a $38,200.00 "commitment fee." All of these reductions are taken directly from items on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17]. The Plaintiffs contend that these reductions bring the actual principal advanced on the Original Southern Colony/UDF III Note [Exhibit No. 3] to $1,583,300.00, down from a face value of $1,911,500.00.

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full amounts. In so doing, the Defendants do not specify an amount advanced as principal, and instead appear to rely on the Original Southern Colony/UDF III Note [Exhibit No. 3] and the Loan History of UDF III on Loan of Hidden Lakes on Loan of Southern Colony [Exhibit No. 18] for the principal actually advanced. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] indicates a disbursement of funds to Southern Colony in the amount of $1,829,185.00 on February 21, 2007. The Loan History documents do not indicate how this number was reached, but the Court will assume that this number represents the full principal face value of

---

**18.** This motion for modification requests approval of an increase to the amount guaranteed under the Hidden Lakes/UDF III Guaranty Agreement [Exhibit No. 25] by $1,720,320.000, mirroring the increase in the amount owed under the Hidden Lakes/UDF III Notes.

$1,911,500.00, reduced by the interest reserve of $40,000.00, the administration fee of $4,115.00, and the commitment fee to UDF of $38,200.00—which results in the amount of $1,829,185.00.

By implication, the Court assumes that both parties agree that the interest reserve of $40,000.00 does not represent principal actually advanced (pursuant to the uncontested express language of this Note). In addition, because the accuracy of an entry on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] showing a payment made under this Note on June 7, 2007 in the amount of $24,696.27 has not been challenged, the Court assumes that this entry is accurate. The next step in the analysis is to characterize the four items over which the parties impliedly dispute: (1) the $38,200.00 commitment fee to UDF III; (2) the $4,115.00 administrative fee to UDF III; (3) the $150,000.00 extension fee; and (4) the $100,000.00 in option payments. The Court also finds it necessary to characterize a legal fee in the amount of $693.20 charged against the principal under the Southern Colony/UDF III Note [Exhibit No. 3], as recorded on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]. These items are addressed in turn.

Under Texas contract law, "[w]hen construing a contract, the court's primary concern is to give effect to written expression of the parties' intent." *Forbau*, 876 S.W.2d at 133. A contract "is to be construed in accordance with its plain language." *Gen. Am. Indem. Co.*, 339 S.W.2d at 661. Where the words in a contract are "clear and unambiguous," the rules of construction are not to be applied. *Id.* The unambiguous words of a contract are deemed to "express the intention of the parties, because objective, not subjective, intent controls." *Derr Constr. Co.*, 846

S.W.2d at 861. In determining the meaning of the words of a contract, the Court is "bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau*, 876 S.W.2d at 133. "The contract must be considered as a whole." *Id.* "Moreover, each part of the contract should be given effect." *Id.* Accordingly, the Court will look first to the language of the entire Southern Colony/UDF III Notes to determine how the parties intended the fees to be characterized. Only if the terms of these Notes are ambiguous as to how a fee should be characterized, will the Court look to the rules of construction or extrinsic evidence to classify the fees at issue.

■ The Court will first characterize the $38,200.00 commitment fee and the $4,115.00 administrative fee because the analysis is almost identical to the second lien fee and the commitment fee to UDF III under the Original Hidden Lakes/UDF III Note [Exhibit No. 22], above. The plain language of Section 2(c)—"Loan Expenses; Fees—Commitment Fee"—of the Original Southern Colony/UDF III Note [Exhibit No. 3] clearly contemplates a commitment fee of $38,200.00 that constitutes an advance of principal. Section 2(c), in relevant part, states that the commitment fee, "upon disbursement ... shall automatically constitute principal outstanding hereunder, and cause a corresponding increase in the aggregate outstanding amount of Borrower's obligations hereunder...." The plain language of Section 2(b)—"Loan Expenses; Fees—Loan Administration Fee" of the Original Southern Colony/UDF III Note [Exhibit No. 3] also clearly contemplates an administration fee of $4,115.00 constituting principal actually advanced in language nearly identical to that used for the commitment fee. Therefore, the Court finds that the $38,200.00 commitment fee and the $4,115.00 administrative fee are

properly characterized as principal actually advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3].

■ The next items to be characterized are the $150,000.00 extension fee and the $100,000.00 option payments. The extension fee and the option payments are listed as items 208 and 209 on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17] under the heading "200. AMOUNTS PAID BY OR IN BEHALF OF THE LENDER." This section of the Settlement Statement is organized with payments on the left side of the table matched with corresponding amounts received by the seller on the right side. Because there is no other evidence in the record as to either fee's nature, the Court assumes that these items represent payments made by UDF III to the seller on behalf of Southern Colony. Section 2(a) of the Original Southern Colony/UDF III Note [Exhibit No. 3], titled "Loan Expenses; Fees— Loan Expenses," states that "upon Lender's demand ... Borrower shall pay Lender the full amount of all Loan Expenses incurred by lender." "Loan Expenses" are defined in the Original Southern Colony/UDF III Note [Exhibit No. 3] as "all fees and expenses incurred by the Lender in connection with the Loan ... including ... closing costs." Thus, the Court finds that the $150,000.00 extension fee and the $100,000.00 option payments constitute Loan Expenses incurred in closing, and which are properly characterized as Commitment Advances of Principal under Section 3(a) of the Original Southern Colony/UDF III Note [Exhibit No. 3].

■ Finally, the Court must characterize the legal fee in the amount of $693.20 charged against principal under the Original Southern Colony/UDF III Note [Exhibit No. 3] on May 11, 2007. The Court is persuaded that this fee is properly characterized as principal for two reasons. First, it is characterized as such under the Southern Colony/UDF III Notes [Exhibits No. 3 & 14].[19] Second, the accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] has not been contested, and it, along with the Settlement Statement for purchase of Hidden Lakes Property [Exhibit No. 17], is the only record of the transactions that occurred in connection with the loan between UDF III and Southern Colony. As such, the Court will assume the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 36] to be an accurate statement of the transactions in connection with the Southern Colony/UDF III Notes [Exhibits No. 3 & 14] to the extent that it is not contradicted by other evidence on the record. To reach the final tally under the Original Southern Colony/UDF III Note [Exhibit No. 3], the Court aggregates the various items identified as principal in the analysis above:

- *Additions to the principal actually advanced under the Original Southern Colony/UDF III Note:*

 1. The disbursement of $1,829,185.00 [20];

19. Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use, forebearance or detention of money." This language tracks the language of Tex. Fin.Code Ann. § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance,

or detention of money." Tex. Fin.Code § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.

20. The $150,000.00 extension fee and the $100,000.00 in option payments, character-

2. The Commitment Fee in the amount of $38,200.00;

3. The Administrative fee in the amount of $4,115.00; and

4. The legal fee in the amount of $693.20.

- *Reductions to the principal actually advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3]:*

1. The payment made under this Note on June 7, 2007 in the amount of $24,696.27.

The result, after aggregating these items, is the sum of $1,847,496.93.

```
 $ 1,829,185.00 (Disbursement)
+ $ 38,200.00 (Commitment Fee)
+ $ 4,115.00 (Administrative Fee)
+ $ 693.20 (Legal Fee)
- $ 24,696.27 (Payment)
 $ 1,847,496.93 (principal actually advanced
 under the Original South-
 ern Colony/UDF III Note)
```

**Therefore, the Court finds that the amount of principal advanced under the Original Southern Colony/UDF III Note [Exhibit No. 3] is $1,847,496.93.**

*(b) The Amended Southern Colony/UDF III Note*

The purpose of the Amended Southern Colony/UDF III Note [Exhibit No. 14] was to extend the term of the Original Southern Colony/UDF III Note [Exhibit No. 3] and to increase the interest reserve under these Notes from $40,000 to $1,040,000 to reflect this longer term. [Finding of Fact No. 19.] The Court assumes, pursuant to the uncontested express language of the Amended Southern Colony/UDF III Note [Exhibit No. 14], that the parties agree that this increase in the interest reserve is not properly characterized as principal actually advanced under the Amended Southern Colony/UDF III Note [Exhibit No. 14].

Neither party addresses the following pre-petition fees and charges found on the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] in their pleadings, but the Court finds it necessary to characterize these fees and charges in order to reach an accurate estimate of the principal actually advanced under the Amended Southern Colony/UDF III Note [Exhibit No. 14]: (1) an extension fee in the amount of $87,345.00 on August 22, 2007; (2) a "Draw" in the amount of $41,376.15 on August 22, 2007; (3) a "Curtailment" payment in the amount of $30,000.00 on August 22, 2007; (4) a "Curtailment" payment in the amount of $57,345.00 on August 22, 2007 (together, the Curtailment Payments); (5) Legal Fees in the amount of $3,383.60 on September 11, 2007; (6) Legal Fees in the amount of $263.75 on October 16, 2007 (together, the Legal Fees); and (7) Miscellaneous Fees in the amount of $2,400.00 on December 10, 2007.

The first item to be characterized is the extension fee in the amount of $87,345.00 on August 22, 2007. This extension fee is not explicitly characterized in the Amended Southern Colony/UDF III Note [Exhibit No. 14] as interest or principal.[21] However, the Court is persuaded

---

ized as principal above, are components of the disbursement, pursuant to the language of the Original Southern Colony/UDF III Note. As such, they are not listed as "Additions to the principal actually advanced under the Original Southern Colony/UDF III Note."

21. The Original Southern Colony Note [Exhibit No. 3] has a face value of $1,911,500.00.

The Amended Southern Colony Note [Exhibit No. 14] has a face value of $2,998,845.00, which, by the express language of the Amended Note, was to "accommodate" the increase to the interest reserve $1,040,000.00. However, the face value of the Original Southern Colony Note [Exhibit No. 3], $1,911,500.00, added to the increase in the interest reserve under the Amended Southern Colony Note

that it is properly characterized as principal. The Amended Southern Colony/UDF III Note [Exhibit No. 14] explicitly provides that it is an amendment to, and not a restatement of, the Original Southern Colony/UDF III Note [Exhibit No. 3]. Under Texas law, "even in the absence of an express merger clause, all prior oral and written agreements are presumed to merge into a subsequent written contract." *Yasuda Fire & Marine Ins. Co. of Am. v. Criaco*, 225 S.W.3d 894, 899 (Tex.App.-Houston [14th Dist.] 2007). Thus Sections 2(a) & (d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] operate to characterize this extension fee as principal.[22] Accordingly, the Court finds that the execution of the Amended Southern Colony/UDF III Note added $87,345.00 to the principal obligation under the Southern Colony/UDF III Notes.

■ The second and third items to be characterized are the Curtailment Payments. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] shows a flurry of activity on August 22, 2007 including entries for, *inter alia:* (1) the extension fee in the amount of $87,345.00; (2) the Curtailment Payments; and (3) the "Draw" in the amount of $41,376.15. The Curtailment Payments are listed on the Loan History of UDF III

on Loan of Southern Colony [Exhibit No. 18] as payments against the principal of the loan, *i.e.,* they reduce the outstanding principal under the Southern Colony/UDF III Notes. The Southern Colony/UDF III Notes [Exhibits No. 3 & 14] provide that "all payments on this Note shall be applied first to unpaid Loan Expenses due hereunder, next, to unpaid accrued interest, and last, to principal outstanding under this note."[23] Pursuant to the terms of the Southern Colony/UDF III Notes [Exhibits No. 3 & 14], the fees that had been charged as of August 22, 2007 were characterized as principal, and the accrued interest was "paid" out of the interest reserve upon maturity, also becoming principal. Accordingly, the Curtailment Payments are properly deducted from the amount of principal actually advanced under the Southern Colony/UDF III Notes. The sum of the two Curtailment Payments listed above comes to the exact amount of the extension fee—*i.e.,* $87,345.00. So, on the same day the amount of the extension fee was added to the principal actually advanced under the Southern Colony/UDF III Notes, it was eliminated by the Curtailment Payments.

■ The fourth item to characterize under this analysis is the Draw in the

[Exhibit No. 14], *i.e.,* $1,000,000.00 (from $40,000.00 to $1,040,000.00), results in a sum of $2,911,500.00—which is $87,345.00 less than the face amount of the Amended Southern Colony Note [Exhibit No. 14]. This additional amount of $87,345.00 is explained by the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18], which records a "LOC Ext Fee," in the exact amount of $87,345.00, charged against principal on 08/22/2007.

22. Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use,

forebearance or detention of money." This language tracks the language of Tex. Fin.Code Ann. § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance, or detention of money." Tex. Fin.Code Ann § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.

23. Section 5(a) of the Original Southern Colony Note [Exhibit No. 3] (incorporated by reference to the Amended Southern Colony Note [Exhibit No. 14]).

amount of $41,376.15 on August 22, 2007. The Draw is not referenced anywhere in the record besides the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]. It is not memorialized in the Southern Colony/UDF III Notes, so the Court cannot rely on the language of these Notes to properly characterize the Draw. However, the accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No. 17], is the only record of the transactions that occurred in connection with the loan between UDF HI and Southern Colony. As such, the Court will assume the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] to be an accurate statement of the transactions in connection with the Southern Colony/UDF III Notes [Exhibits No. 3 & 14] to the extent that it is not contradicted by other evidence in the record. Moreover, as the Plaintiffs have not challenged the characterization of the Draw, the Court finds it reasonable to conclude that the characterization of the Draw in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] as principal is accurate. Buttressing this conclusion is the designation of each of the transactions involved in the original disbursement of the Commitment under the Original Southern Colony/UDF III Note [Exhibit No. 3] as a "draw" in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]—the only other recorded transactions in the Loan History to bear that designation. Implicit in this common designation is that the Draw being analyzed also involved the advance of funds, which is the type of loan transaction most commonly associated with the concept of "principal" under a loan. Accordingly, the Court finds that the Draw in the amount of $41,376.15 on August 22, 2007 to be properly characterized as principal.

The fifth, sixth, and seventh items to be characterized are the Legal Fees and the Miscellaneous Fees in the amount of $2,400.00. The Court is persuaded that these fees are properly characterized as principal for two reasons. First, as with the extension fee, they are characterized as such under the Southern Colony/UDF III Notes.[24] Second, as was the case with the Draw, the Court assumes that the characterization of these fees as principal is accurate unless it is contradicted by some other evidence in the record. As there is no contradictory evidence in the record, the Court concludes that these fees are properly characterized as principal actually advanced.

To come to the final tally for principal actually advanced under the Amended Southern Colony/UDF III Note, the Court aggregates all of the items characterized as principal in the analysis above:

- *Additions to the principal actually advanced under the Amended Southern Colony/UDF HI Note:*
 - The Extension Fee in the amount of $87,345.00;
 - The Draw in the amount of $41,376.15;

---

24. Section 2(d) of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that "such fees and expenses are not, are not intended to be, and shall not be characterized as, interest or as compensation for the use, forebearance or detention of money." This language tracks the language of Tex. Fin.Code § 301.002(a)(4) which defines "interest" as "compensation for the use, forebearance, or detention of money." Tex. Fin.Code Ann. § 301.002(a)(4) (Vernon 2009). Thus, the express language of the Original Southern Colony/UDF III Note [Exhibit No. 3] provides that the extension fee is not interest, and therefore, by implication, the fee should be characterized as principal.

- The Legal Fees in the amounts of $3,383.60 and $263.75; and

- The Miscellaneous Fees in the amount of $2,400.00.

- *Reductions to the principal actually advanced under the Amended Southern Colony/UDF III Note:*

 - The Curtailment Payments in the amounts of $30,000.00 and $57,345.00.

The calculation is shown below:

| | $ | 87,345.00 | (Extension Fee) |
|---|---|---|---|
| + | $ | 41,376.15 | (Draw) |
| + | $ | 3,383.60 | (Legal Fees) |
| + | $ | 263.75 | (Legal Fees) |
| + | $ | 2,400.00 | (Miscellaneous Fees) |
| − | $ | 30,000.00 | (Curtailment Payment) |
| − | $ | 57,345.00 | (Curtailment Payment) |
| | $ | 47,423.50 | (principal actually advanced under the Amended Southern Colony/UDF III Note) |

**Accordingly, the Court finds that a net total of $47,423.50 was advanced under the Amended Southern Colony/UDF III Notes at the time Perry filed his Chapter 11 petition.**

To reach the final tally for the combined Southern Colony/UDF III Notes, the Court adds the principal actually advanced under the Original Southern Colony/UDF III Note (*i.e.,* $1,847,496.93), as found above, to the principal actually advanced under the Amended Southern Colony/UDF III Note (*i.e.,* $47,423.50). **Accordingly, the Court finds that the total principal actually advanced under the Southern Colony/UDF III Notes comes to $1,894,920.43.**

*(5) What is the dollar amount of interest due on the principal actually advanced under the Hidden Lakes/UDF III Notes?*

The accuracy of the Loan History of UDF III on Loan of Hidden Lakes [Ex-hibit No. 27] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No. 35], is the only transaction record relating to the loan from UDF III to Hidden Lakes. As such, to the extent that it is not contradicted by other evidence in the record, the Court will assume Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] to be an accurate statement of the interest due on the Hidden Lakes/UDF III Notes. As noted above, UDF III is not entitled to post-petition interest, so the Court need only calculate up to the date Perry filed his Chapter 11 petition (*i.e.,* up to April 11, 2008). The Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27] gives the dollar amounts of interest accrued each month up to April 1, 2008 as shown in Table 1, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of Hidden Lakes [Exhibit No. 27], is computed by the Court in the following way:

The aggregate principal is calculated as of April 1, 2008 (the principal actually advanced under the Hidden Lakes/UDF III Notes added to the matured interest[25] that has accrued as of April 1, 2008):

- $1,481,250.00 (principal actually advanced) + $195,818.91 (matured interest)[26]

 = $1,677,068.91 (Aggregate Principal as of April 1, 2008).

The Court then multiplies the aggregate principal as of April 1, 2008 by the interest rate under the Hidden Lakes/UDF III Notes (15%), and then divides this number

---

**25.** The Hidden Lakes/UDF III Notes contract for compound interest, which means matured interest accrues interest just as the principal does.

**26.** This number is the sum of all matured interest from the inception of this Note to April 1, 2008. The monthly components making up this sum are listed in Table 1, below.

by 365 days [27] in order to reach a dollar amount for the interest that accrues each day:

- $1,677,068.91 (Aggregate Principal as of April 1, 2008) × 0.15

 = $251,560.34 (dollars of interest per year);

- $251,560.34 (dollars of interest per year)/365 days

 = $689.21 (interest accrued per die m between April 1, 2008 and April 11, 2008).

The Court then multiplies this interest accrued per die m by the number of days that interest accrued between April 1, 2008 and April 11, 2008. The Court sets this number at 10 full days between April 1 and April 10: [28]

- $689.21 (interest accrued per die m) × 10 days = $6,892.06.

The computed interest between April 1, 2008 and the aggregate interest accrued *and* currently due over the full pre-petition life of the loan April 11, 2008, as computed by the Court, are shown in Table 1, below.

*Table 1—Interest Matured and Still Owed Under the Hidden Lakes/UDF III Notes*

| Due Date[29] | Interest Accrued since Last Due Date |
|---|---|
| May 31, 2007 | $ 5,856.16 |
| June 30, 2007 | $ 17,640.69 |
| July 31, 2007 | $ 18,466.20 |
| August 31, 2007 | $ 18,704.37 |
| September 30, 2007 | $ 18,331.61 |
| October 31, 2007 | $ 19,176.20 |
| November 30, 2007 | $ 18,794.03 |
| December 31, 2008 | $ 19,659.93 |
| January 31, 2008 | $ 19,910.39 |
| February 29, 2008 | $ 18,866.53 |
| March 31, 2008 | $ 20,412.80 |

| Date Perry filed Ch. 11 petition | Interest accrued since last due date ($) |
|---|---|
| April 11,2008 | $ 6,892.06 |

| **Sum Total of interest as of April 11, 2008:** | $202,710.97 |
|---|---|

The sum of these amounts represents the amount of interest properly due under these Notes. **As a result, the Court finds that $202,710.97 of interest has accrued under the Hidden Lakes/UDF III Notes.**

*(6) What is the dollar amount of interest due on the principal actually advanced under the Southern Colony/UDF III Notes?*

The accuracy of the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No. 17], is the only record of the transactions that occurred in connection with the loan transaction. As such, the Court will assume Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] to be an accurate statement of the interest charged and accrued

---

27. Interest is computed based on a year of 365 days.

28. Some fraction of the per die m interest probably accrued under this Note on April 11, 2008, prior to the moment of the official filing of Perry's Chapter 11 petition. But because this amount is not large enough to materially affect the Court's analysis, and accurate calculation of the amount would be burdensome, the Court simply uses the 10 full days that interest accrued in April for the purposes of the interest computation.

29. Dates listed are actually the last day interest accrued each month before maturing. These dates were chosen because they frequently coincide with the date the interest payment was made and, because they are helpful in showing the number of days that had passed between each due date—*i.e.* it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/*30*/2007) and 31 days in December 2007 (12/*31*/2007).

on the Southern Colony/UDF III Notes [Exhibits No. 3 & 14] for the purposes of this claims estimation procedure, and to the extent that it is not contradicted by other evidence in the record. Unlike the situation with the Hidden Lakes/UDF III Notes, where all matured interest accrued under the loan is still owing, the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] indicates that some matured interest was paid off by Southern Colony. In this section, the Court will calculate both the amount of matured interest *charged* under the loan, and the amount of matured interest *currently owed* under the loan.

First, the Court calculates the amount of interest charged under the Southern Colony/UDF III Notes up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF HI on Loan of Southern Colony [Exhibit No. 18] gives the dollar amounts of interest accrued each month up to April 1, 2008, which is organized by month in Table 2, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] is computed by the Court.

As before, the Court calculates the interest accrued up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] gives the

dollar amounts of interest accrued each month up to April 1, 2008, which is organized by month in Table 2, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, which is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] is computed by the Court in the following manner: First, the aggregate principal is calculated as of April 1, 2008 (the principal actually advanced under the Southern Colony/UDF III Notes added to the matured interest [30] that has accrued as of April 1, 2008):

- $1,894,920.43 (principal actually advanced) + $247,709.75 (matured interest) [31]

 = $2,142,630.18 (Aggregate Principal as of April 1, 2008).

The Court then multiplies the aggregate principal as of April 1, 2008 by the interest rate under the Southern Colony/UDF III Notes of 15% and then divides this number by 360 days [32] in order to reach a dollar amount for the interest that accrues each day:

- $2,142,630.18 (Aggregate Principal as of April 1, 2008) × 0.15

 = $321,394.53 (dollars of interest per year);

- $321,394.53 (dollars of interest per year)/360 days

30. The Hidden Lakes/UDF III Notes contract for compound interest, which means matured interest accrues interest just as the principal does.

31. This number is the sum of all matured interest still owing under this Note, from the inception of this Note to April 1, 2008. The monthly components making up this sum are listed in Table 2, below.

32. Interest is computed based on a 360–day year. This differs from the interest calcula-

tion under the Hidden Lakes/UDF III Notes, which uses a year of 365 days, as noted above in fn. 27. Under the Texas Finance Code, parties may agree to calculate interest based on a 360–day year. Tex. Fin.Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365–day year. *See, e.g., Lawler v. Lomas & Nettleton Mortg. Investors*, 691 S.W.2d 593, 596 (Tex.1985); *Fed. Sav. & Loan Ins. v. Kralj*, 968 F.2d 500, 505 (5th Cir.1992).

= \$892.76 (interest accrued per diem between April 1, 2008 and April 11, 2008).

The Court then multiplies this interest accrued per die m by the number of days that interest accrued between April 1, 2008 and April 11, 2008. The Court sets this number at 10 full days between April 1 and April 10: [33]

- \$892.76 (interest accrued per die m) × 10 days = \$8,927.62 (interest accrued between April 1, 2008 and April 11, 2008).

Both the computed interest between April 1, 2008 and April 11, 2008, and the aggregate interest accrued over the full pre-petition life of the loan April 11, 2008, as computed by the Court, are also shown in Table 2, below:

*Table 2—Interest Matured and Still Owed Under the Southern Colony/UDF III Notes*

| Due Date[34] | Interest Accrued since Last Due Date[35] |
| --- | --- |
| 02/28/2007 | \$ 6,238.33 |
| 03/31/2007 | \$ 24,254.12 |
| 04/30/2007 | \$ 9,507.55 |
| 05/31/2007 | \$ 0 [36] |
| 06/30/2007 | \$ 0 |
| 07/31/2007 | \$ 0 |
| 08/31/2007 | \$ 24,871.56 |
| 09/302007 | \$ 24,758.70 |
| 10/31/2007 | \$ 25,920.13 |
| 11/30/2007 | \$ 25,409.59 |
| 12/31/2007 | \$ 26,606.78 |
| 01/31/2008 | \$ 26,959.45 |
| 02/29/2008 | \$ 25,545.89 |
| 03/31/2008 | \$ 27,637.65 |

| Date Perry filed Ch. 11 petition | Interest accrued since last due date (\$) |
| --- | --- |
| April 11, 2008 | \$ 8,927.62 |
| Sum Total of interest accrued as of April 11, 2008: | \$256,637.37 |

The sum of these amounts represents the amount of interest properly due under this Note. As such, the Court finds that \$256,637.37 has matured and is still owing under the Southern Colony/UDF III Notes.

Next, the Court calculates the amount of interest charged (all interest that has matured, whether still owed or not) under the Southern Colony/UDF III Notes up to April 11, 2008, the date of Perry's Chapter 11 filing. The Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18] gives the dollar amounts of interest

33. Some fraction of the per die m interest probably accrued under this Note on April 11, 2008, prior to the moment of the official filing of Perry's Chapter 11 petition. But because this amount is not large enough to materially affect the Court's analysis, and accurate calculation of the amount would be burdensome, the Court simply uses the 10 full days that interest accrued in April for the purposes of the interest computation.

34. Dates listed are actually the last day interest accrued each month before maturing. This date was chosen because it frequently coincides with the date the interest payment was made and, because it is helpful in showing the number of days that had passed between each due date—*i.e.* it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/*30*/2007) and 31 days in December 2007 (12/*31*/2007).

35. Interest is calculated based on a 360–day year. This differs from the interest calculation under the Hidden Lakes/UDF III Notes, which uses a year of 365 days, as noted above in fn.27. Under the Texas Finance Code, parties can agree to calculate interest based on a 360–day year. Tex. Fin.Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365–day year. *See, e.g., Lawler,* 691 S.W.2d at 596; *Fed. Sav. & Loan Ins.,* 968 F.2d at 505.

36. The Loan History of UDF III on the Loan of Southern Colony [Exhibit No. 18] does not record any interest accrued between 4/30/2007 and 07/31/2007.

accrued each month up to April 1, 2008, which is organized by month in Table 3, below. The amount of interest accrued between April 1, 2008, and April 11, 2008, is not recorded in the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18]. However, because there is no evidence of a payment applying to the interest accrued in this period, the amount of interest charged is equal to the amount found still owing for this period— i.e., $8,927.62. The amount of interest charged under the Southern Colony/UDF III Notes is summarized in Table 3, below:

**Table 3—Interest Charged Under the Southern Colony/UDF III Notes**

| Due Date[37] | Interest Accrued since Last Due Date[38] ($) |
| --- | --- |
| 02/28/2007 | $ 6,238.33 |
| 03/31/2007 | $ 24,254.12 |
| 04/30/2007 | $ 23,774.91 |
| 05/31/2007 | $ 24,696.27 |
| 06/30/2007 | $ 23,902.41 |
| 07/31/2007 | $ 24,699.16 |
| 08/31/2007 | $ 24,871.56 |
| 09/302007 | $ 24,758.70 |
| 10/31/2007 | $ 25,920.13 |
| 11/30/2007 | $ 25,409.59 |
| 12/31/2007 | $ 26,606.78 |
| 01/31/2008 | $ 26,959.45 |
| 02/29/2008 | $ 25,545.89 |
| 03/31/2008 | $ 27,637.65 |
| Date Perry filed Ch. 11 petition | Interest accrued since last due date ($) |
| April 11, 2008 | $ 8,927.62 |

**37.** Dates listed are actually the last day interest accrued each month before maturing. This date was chosen because it frequently coincides with the date the interest payment was made and, because it is helpful in showing the number of days that had passed between each due date—i.e. it is easily recognized from the dates listed that interest accrued over a period of 30 days in November 2007 (11/*30*/2007) and 31 days in December 2007 (12/*31*/2007).

Sum Total of interest accrued as of April 11,2008: $344,202.57

The sum of these amounts represents the amount of interest properly charged under this Note. As such, the Court finds that $344,202.57 has been charged under the Southern Colony/UDF III Notes.

*(7) Conclusion: What is the threshold aggregate amount of UDF III's Claims under the Hidden Lakes/UDF III Notes and the Southern Colony/UDF III Notes?*

The Court has found that the amount of principal actually advanced of the Hidden Lakes/UDF III Notes to be $3,201,570.00. The Court has also found the total amount of interest due under the Hidden Lakes/UDF III Notes to be $202,710.97. The result is a total claim of $3,404,280.97 for UDF III under the Hidden Lake Notes.

The Court has found that the total principal actually advanced under the Southern Colony/UDF III Notes is $1,894,920.43. The Court has also found the total amount of interest due under the Southern Colony/UDF III Notes to be $256,637.37. The sum of these two figures results in a total claim of $2,151,557.80 for UDF III under the Southern Colony/UDF III Notes.

The aggregate claims under the UDF III Notes is $5,555,838.77. These findings are summarized in Table 4, below:

**38.** Interest is calculated based on the number of days in a month and a year of 360 days. This differs from the interest calculation under the Hidden Lakes/UDF III Notes, which use a year of 365 days, as noted above in fn. 27. Under the Texas Finance Code, parties can agree to calculate interest based on a 360–day year. Tex. Fin.Code Ann. § 306.003 (Vernon 2009). Such an agreement does not affect the usury analysis, which uses a 365–day year. *See, e.g., Lawler,* 691 S.W.2d at 596; *Fed. Sav. & Loan Ins.,* 968 F.2d at 505.

*Table 4*

| Applicable Notes | Principal Actually Advanced | Interest still owed as of April 11, 2008 | Threshold Total Claim |
|---|---|---|---|
| Hidden Lake/UDF III Notes | $3,201,570.00 | $202,710.97 | $3,404,280.97 |
| Southern Colony/ UDF III Notes | $1,894,920.43 | $256,637.37 | $2,151,557.80 |
| **Both Sets of Notes** | | | **$5,555,838.77** |

Due to the mechanical nature of the above analysis, the Court estimates that there is a 0% probability of reaching a materially different result in a full trial on the merits. Accordingly, the Court does not discount UDF III's claims on the basis of the analysis above.

### ii. Are the Hidden Lakes/UDF III or Southern Colony Loans Usurious?

The Plaintiffs contend that the loans made by UDF III to Hidden Lakes and Southern Colony charge a usurious amount of interest as contracted for, charged, or received in connection with the loan, and that the penalties resulting under Tex. Fin.Code § 305.001(a–1) should be set off against the claim of $5,555,838.77 under the UDF III Notes. The Plaintiffs make two assertions to support their argument that the interest rate is usurious: (1) the interest charged on the principal actually advanced (as found by the Court,

above) is usurious; and (2)(i) even if the interest charged on this amount is not usurious, the various fees associated with the loan, which the Court characterized as principal actually advanced in section C(i) of the Conclusions of Law, must be *recharacterized* as interest for the purposes of usury law; (2)(ii) furthermore, as a result of this recharacterization, the total amount of interest charged or collected on the "true principal" rises to usurious levels. This second assertion entails a characterization of these fees that is specific to the usury analysis, and does not otherwise affect the amount of principal actually advanced as found by the Court in section C(i) of the Conclusions of Law.[39]

The Defendants dispute the Plaintiffs' argument and assert the following defenses: (1) Perry, as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony are

---

39. *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1206 (5th Cir.1985) ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious*.") (emphasis added), *citing First State Bank of Bedford*, 563 S.W.2d at 575 (" 'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury' "*), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782–

83. Even if the Court finds that usurious interest is contracted for, charged, or received, the Notes remain valid and enforceable by UDF and UDF III, "provided allowance is made for the penalty." *Vordenbaum*, 611 S.W.2d at 465, *citing Wall*, 526 S.W.2d at 151–52. Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin.Code Ann § 305.001(a-l) (Vernon 2009). How Perry's obligation (as a guarantor) to UDF III would be affected, if at all, by the assessment of usury penalties in this case is addressed below, along with the defenses to the usury claims which UDF III has raised.

equitably estopped from claiming UDF III contracted for, charged, or received usurious interest; (3) the savings clauses in the Hidden Lakes/UDF III Notes and the Southern Colony/UDF III Notes are effective to prevent usurious interest from being contracted for, charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury penalty because setoff requires mutual obligations; and (5) in the alternative, if Perry is entitled to setoff due to usury penalties, the amount of setoff is limited to the amount which would be distributed to Perry due to his equity interest in Perry Properties. Each contention is taken in turn.

*(1) Are the UDF III Notes usurious if all principal actually advanced is characterized as principal for the usury analysis?*

Texas law applies to the question of whether the notes at issue are usurious, pursuant to the choice of law clauses in the UDF III Notes. The applicable usury ceiling in accordance with Chapter 303 is 18% *per annum*.[40] Under Tex. Fin.Code, § 306.004, to determine whether a commercial loan is usurious, the interest rate is computed by amortizing or spreading, using the actuarial method during the stated term of the loan, all interest at any time contracted for, charged, or received in connection with the loan. Tex.

Fin.Code Ann. § 306.004 (Vernon 2009); *see also* Tex. Fin.Code Ann. § 302.101(Vernon 2009). Compound interest is not usurious under Texas law. *Bair Chase Property Co. v. S & K Dev. Co.*, 260 S.W.3d 133, 141 (Tex.App.-Austin 2008). Interest which has matured may bear interest at the highest lawful rate, which is 18% in the instant dispute. *Id.*

The first step in the analysis is to determine whether the parties contracted for usurious interest. The UDF III Notes explicitly contract for compound interest. [Exhibit No. 3 p. 6]; [Exhibit 12, p. 6 ¶ 12]; [Exhibit 22 p. 8]; [Exhibit 40 ¶ 3]. In addition, the UDF III Notes [Exhibits No. 3, 13, 22 & 40] charge only 15% interest accrued and compounded monthly, so it is clear that, under Texas law, UDF HI has not *contracted* for usurious interest.

The second step in the analysis is to determine if usurious interest was charged or received under the UDF III Notes [Exhibits No. 3, 13, 22 & 40]. As just noted, compound interest is allowed on matured interest at the highest rate allowable by law. *Bair Chase Property Co.*, 260 S.W.3d at 141. A usury ceiling calculated based on matured interest as well as "X" amount of principal will be greater than a usury ceiling calculated based solely on that same "X" amount of principal. As a result, the ability to charge compound interest under the usury

---

**40.** All of the UDF III Notes contain identical language providing that the "ceiling shall be the 'weekly ceiling' as defined in the Texas Finance Code." Tex. Fin.Code § 303.002 provides that "parties to a written agreement may agree to an interest rate . . . that does not exceed the applicable weekly ceiling." Tex. Fin.Code § 303.002 (Vernon 2009). The weekly ceiling, true to its name, varies week to week, and is published by the Secretary of State in the Texas Register. *Id.; Id.* § 303.011. When parties elect to use the weekly ceiling, the relevant ceiling is the weekly ceiling which was in effect on the date the agreement was originally executed. *Reagan v. City Nat. Bank, N.A.*, 714 S.W.2d 425, 428 (Tex.App.-Eastland 1986). Tex. Fin.Code § 303.009(a) provides that "[i]f the rate computed for the weekly, monthly, quarterly, or annualized ceiling is less than 18 percent a year, the ceiling is 18 percent a year." Tex. Fin.Code Ann. § 303.009(a) (Vernon 2009) The parties agree that this 18% ceiling is applicable to the UDF III Notes [Exhibits No. 3, 13, 22 & 40].

statute effectively increases the maximum dollar amount of interest that a creditor may charge over time. This fact favors UDF III in this analysis because, having contracted for compound interest, UDF III is effectively afforded a higher usury ceiling under the UDF III Notes [Exhibits No. 3, 13, 22 & 40]—*i.e.*, UDF III may legally charge or receive more interest in absolute dollar terms than would be the case if it had not contracted for compound interest. However, on the facts of this particular dispute, UDF III does not even need to take advantage of the effectively higher usury limit allowed by compounding matured interest because the amount of interest charged or received under the UDF III Notes [Exhibits No. 3, 13, 22 & 40] is less than the 18% *per annum* ceiling even if the Court treats all interest charged or received as borne by the amount of advanced principal alone.

In order to calculate the applicable dollar amount of the 18% *per annum* ceiling according to the actuarial method during the stated term of the loan, the analysis starts with the multiplication of the amount of applicable advanced principal (*i.e.*, pre-petition principal—$1,481,250.00 for the Hidden Lakes/UDF III Notes; $1,871,500.00 for the Original Southern Colony/UDF III Note from February 21,-2007 to June 6, 2007; $1,847,496.93 for the Original Southern Colony/UDF HI Note from June 7 to August 22, 2007; and $1,894,920.43 for the Amended Southern Colony/UDF III Note)[41] by 18%. The resulting products represent the maximum legal dollar amount of interest that may be legally charged under each Note each year.

- Hidden Lakes/UDF III Notes:
- $1,481,250.00 (pre-petition principal) × 0.18 (interest rate ceiling)

 = $266,625.00 (Annual Interest Rate Ceiling)
- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):
- $1,871,500.00 (pre-petition principal) × 0.18 (interest rate ceiling)

 = $336,870.00 (Annual Interest Rate Ceiling)

---

**41.** The Court approaches this portion of the usury analysis of the Southern Colony/UDF III Notes by calculating the interest ceiling for three discrete periods, each bearing interest on different pre-petition amounts of principal actually advanced: (1) $1,871,500.00 under the Original Southern Colony/UDF III Note from February 21, 2007 to June 6, 2007; (2) $1,847,496.93 from June 7 to August 22, 2007 (the period between the payment of $24,696.27 on June 7, 2007 and August 21, 2007, the day prior to the execution of the Amended Southern Colony/UDF III Note); and (3) $1,894,920.43 under the Amended Southern Colony/UDF III Note from August 22, 2007 to April 11, 2008 (the period between the execution of the Amended Southern Colony/UDF III Note and the filing of Perry's Chapter 11 petition). In reality, there are actually four discrete pre-petition periods, each with a different amount of principal actually advanced under these Notes. On May 11, 2007, a $693.20 legal fee was added to the amount of principal actually advanced under the Original Southern Colony/UDF III Note. Thus, technically speaking, there is a fourth period with a different amount of principal actually advanced spanning May 11, 2007 to June 6, 2007. Taking this fourth period into account would require a fourth set of calculations for the Southern Colony/UDF III Notes, but the difference in the usury ceiling calculated between the three part analysis delineated above and a four part approach taking this fourth period into consideration is infinitesimal. As a result, the Court treats this $693.20 legal fee as being advanced on June 7, 2007 to maintain the three step analysis and avoid undue complexity. This three-step approach results in a marginally lower usury ceiling, but does not affect the end result of this analysis. Finally, the Hidden Lakes/UDF III Notes have only one amount of principal actually advanced from the execution of the Note to the filing of Perry's Chapter 11 petition on April 11, 2008.

- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):
- $1,847,496.93 (pre-petition principal) × 0.18 (interest rate ceiling)
 = $332,549.45 (Annual Interest Rate Ceiling)
- Amended Southern Colony/UDF III Note:
- $1,894,920.43 (pre-petition principal) × 0.18 (interest rate ceiling)
 = $341,085.68 (Annual Interest Rate Ceiling)

The next step is to determine a per die m ceiling by dividing each Annual Interest Rate Ceiling, calculated above, by 365 days.

- Hidden Lakes/UDF III Notes:
- $266,625.00 (Annual Interest Rate Ceiling)/365 (Days)
 = $730.48 (Interest Accrued Per Die m Ceiling)
- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):
- $336,870.00 (Annual Interest Rate Ceiling)/365 (Days)
 = $922.93 (Interest Accrued Per Die m Ceiling)
- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):
- $332,549.45 (Annual Interest Rate Ceiling)/365 (Days)
 = $911.09 (Interest Accrued Per Die m Ceiling)
- Amended Southern Colony/UDF III Note
- $341,085.68 (Annual Interest Rate Ceiling)/365 (Days)
 = $934.48 (Interest Accrued Per Die m Ceiling)

The next step is to multiply each Interest Accrued Per Die m Ceiling by the number of days interest was accruing. The Hidden Lakes/UDF III Notes accrued interest from May 22, 2007 to April 11, 2008—a total of 325 days. The Southern Colony/UDF III Notes, as noted in footnote 41, have three discrete periods, each with a different ceiling—(1) a period under the Original Southern Colony/UDF III Note running from February 21, 2007 to June 6, 2007 (a total of 106 days); (2) another period under the Original Southern Colony/UDF HI Note from June 7, 2007 to August 21, 2007 (a total of 75 days); and (3) a period under the Amended Southern Colony/UDF III Note running from August 22, 2007 to April 11, 2008 (a total of 234 days). Multiplying the number of days that each of these Notes was in effect by the per die m ceiling provides the ceiling dollar amount for lawful interest for each period:

- Hidden Lakes/UDF Hi Notes
- $730.48 (Interest Accrued Per Die m Ceiling) × 325 (Days accruing interest)
 = $237,406.00 (Total Allowable Interest Under Notes)
- Original Southern Colony/UDF III Note (February 21, 2007 to June 6, 2007):
- $922.93 (Interest Accrued Per Die m Ceiling) × 106 (Days accruing interest)
 = $97,830.58 (Total Allowable Interest Under Note)
- Original Southern Colony/UDF III Note (June 7, 2007 to August 21, 2007):
- $911.09 (Interest Accrued Per Die m Ceiling) × 75 (Days accruing interest)
 = $68,331.75 (Total Allowable Interest Under Note)
- Amended Southern Colony/UDF III Note

- $934.48 (Interest Accrued Per Die m Ceiling) × 234 (Days accruing interest)

 = $218,668.32 (Total Allowable Interest Under Amended Southern Colony/UDF III Note)

The final step is to aggregate the amounts of interest allowable under the three periods in which different amounts of principal actually advanced bore interest under the Southern Colony/UDF III Notes in order to find the interest ceiling for the full pre-petition term of these Notes so that this amount can be compared to the interest charged on their related loans. This step is unnecessary for the Hidden Lakes/UDF III Notes because there was only one amount of principal actually advanced throughout the full pre-petition term of these Notes—*i.e.*, $237,406.00 represents the entire amount of interest allowable under these particular Notes. Southern Colony/UDF III Notes.

- Southern Colony/UDF Notes
- $97,830.58 (Total Allowable Interest Under Original Southern Colony/UDF III Note from February 21, 2007 to June 6, 2007) + $68,331.75 (Total Allowable Interest Under Original Southern Colony/UDF III Note from June 7, 2007 to August 21, 2007) + $218,668.32 (Total Allowable Interest Under Amended Southern Colony/UDF III Note)

 = $384,830.65 (Total Allowable Interest Under These Particular Notes)

These results for each set of Notes—*i.e.*, $237,406.00 for the Hidden Lakes/UDF III Notes (the Original Hidden Lakes/UDF III Usury Ceiling), and $384,830.65 for the Southern Colony/UDF III Notes (the Original Southern Colony/UDF III Usury Ceiling)—represent the maximum amounts of interest which may be contracted for, charged, or received by UDF III under each set of Notes. The amount of interest actually charged or received under the Hidden Lakes/UDF III Notes is $202,710.97—which is less than the $237,406.00 usury ceiling. The amount of interest actually charged or received under the Southern Colony/UDF III Notes is $344,202.57—which is less than the $384,830.65 ceiling. Therefore, usurious interest was not charged or received under any of the UDF HI Notes. The results of the Court's analysis are organized in Table 5, below.

*Table 5*

| Notes | Maximum Legally Allowable Interest Under Notes | Interest Actually Due Under the Notes as of April 11, 2008. | Usurious interest charged or received? |
|---|---|---|---|
| Hidden Lakes/UDF III Notes | $237,405.82 | $202,710.97 | No |
| Southern Colony/ UDF III Notes | $384,830.65 | $344,439.72 | No |

Due to the mechanical nature of the above analysis, the Court estimates that there is a 0% probability of reaching a different result in a full trial on the merits. As such, the Court will not discount the claims of UDF III due to the usury causes of action advanced by the Plaintiffs so long as principal actually advanced is properly characterized as principal for the usury analysis.

*(2) Should the various fees associated with the UDF III Notes be characterized as interest for the purposes of the usury analysis?*

The Plaintiffs assert that the principal actually advanced under the UDF III Notes, as found by the Court in section C(i) of the Conclusions of Law, should be reduced by characterizing a number of fees which the Court has found to be part of the principal as interest instead, for the purposes of the usury analysis. The fees that the Plaintiffs contend should be re-characterized are as follows: (1) the $100,000.00 in option payments paid in connection with the purchase of the Southern Colony Property; (2) the $150,000 extension fee paid in connection with the Southern Colony Property; (3) the 2% consulting fee in the amount of $28,500.00 to Winchester Equities, LLC; (4) the commitment fees to UDF III in the amounts of $56,250.00 and $38,200.00; (5) the extension fee in the amount of $87,345.00 paid in connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]; (6) the legal fees in the amount of $3,383.60 and $263.75 in connection with the Amended Southern Colony/UDF III Note; (7) the Miscellaneous Fees in the amount of $2,400.00 in connection with the Southern Colony/UDF III Note; and (8) the administrative fee to UDF III in the amount of $4,115.00.[42] All of these reductions are taken directly from items on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17] and the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35].

 Under Texas law, front-end fees paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious. *Perry v. Stewart Title Co.,* 756 F.2d 1197, 1206 (5th Cir.1985), *citing First State Bank of Bedford v. Miller,* 563 S.W.2d 572, 575 (Tex.1978); *Nevels v. Harris,* 129 Tex. 190, 102 S.W.2d 1046, 1048 (1937). However, *bona fide* fees paid to parties other than the lender are neither "characterized as interest nor are deductible from the principal amount." *Perry v. Stewart Title Co.,* 756 F.2d at 1206, *citing Imperial Corp. of Am. v. Frenchman's Creek Corp.,* 453 F.2d 1338, 1343 (5th Cir.1972); *Tanner Dev. Co. v. Ferguson,* 561 S.W.2d 777, 787 (Tex.1977); *Greever v. Persky,* 140 Tex. 64, 165 S.W.2d 709, 711 (1942). Moreover, a *bona fide* commitment fee is not interest within the contemplation of the usury statute because such a fee merely purchases an option permitting the borrower to enter into the loan in the future. *Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979, rehearing denied 1980), *quoting Gonzales County Sav. & Loan Ass'n. v. Freeman,* 534 S.W.2d 903 (Tex.1976). Such a fee "entitles the borrower to a distinctly separate and additional consideration apart from the lending of money." *Id.* As a result, "the lender may charge extra for this consideration without violating the usury laws." *Id.* Where there is a dispute in the evidence as to whether the charge is a *bona fide* commitment fee or merely a device to conceal usury, a question of fact is raised. *Id.; Greever v. Persky,* 140 Tex. 64, 165 S.W.2d 709 (1942).

Thus, the task before the Court is to determine if the fees associated with the Hidden Lakes/UDF III Notes and the

---

**42.** The Court does not consider recharacterizing the one-half share of the commitment fee to UMTH in the amount of $37,875.00, the interest reserves, or the second lien fee because these items have already been found to be either interest or inapplicable to the loans made by UDF III in section C(i) of the Conclusions of Law.

Southern Colony/UDF III Notes should be characterized as fees paid to the lender for initiating or processing the loans, as *bona fide* fees paid to a party other than the lender, or as *bona fide* fees for separate consideration.

■ The Court finds that the "2% consulting fee" of $28,500.00 to Winchester Equities, LLC paid in conjunction with the Hidden Lakes/UDF III Notes, the $100,000.00 in "option payments" and the $150,000.00 "extension fee" paid, and the legal fees in the amounts of $3,383.60 and $263.75 paid in conjunction with the Southern Colony/UDF III Notes are all properly characterized as *bona fide* fees paid to a party other than the lender. The consulting fee to Winchester Equities, LLC is facially so, as it is expressly listed on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] as "2% consulting fee to Winchester Equities, LLC." Moreover, as noted previously, this fee is item 805 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to itemize inspections done at the request of the lender, so the Court will assume this fee represents a payment to an inspector of the Hidden Lakes Property. The $100,000.00 in "option payments" and the $150,000.00 "extension fee" are not described on the Settlement Statement as payments to third parties quite as explicitly as the consulting fee, but even a modest interpretation of the Settlement Statement leads to the same result. As noted above, the extension fee and the option payments are listed as items 208 and 209 on the Settlement Statement for Purchase of the Southern Colony Property [Exhibit No. 17] under the heading "200. AMOUNTS PAID BY OR IN BEHALF OF THE LENDER." This section of the Settlement Statement is organized so that pay-

ments on the left side of the table correspond with amounts received by the seller on the right side. The option payments and extension fee were payments made to the seller—*i.e.,* someone other than the lender—and so therefore the Court finds them to be *bona fide* fees paid to a third party. There is little information on the record concerning the legal fees in the amounts of $3,383.60 and $263.75. However, the Court finds it reasonable to conclude that these legal fees are payments made to third parties (*i.e.,* private law firms), as UDF III does not have a legal department.

■ The Court also finds that the commitment fee of $56,250.00 connected to the Original Hidden Lakes/UDF III Note, and the commitment fee of $38,200.00 connected to the Original Southern Colony/UDF III Note, are *bona fide* commitment fees for which UDF III provided distinct and separate consideration. The plain, identical language of the Loan Commitment Letters [Exhibits No. 3 & 21] explicitly sets this out, stating: "[w]e agree that ... Lender has provided separate and distinct consideration for the Commitment Fee and that the Commitment Fee is not interest or as compensation for the use, forbearance or detention of money." How parties agree to characterize such a fee is not conclusive, and the Court will look beyond the form of a transaction to its substance to determine the existence or nonexistence of usury. *Stedman,* 595 S.W.2d at 488–89. However, there is nothing in the record before the Court indicating that the substance of the transaction was in any way different from the description in the Commitment Letters, so the Court has no reason to believe otherwise. As such, both commitment fees—that associated with the Original Hidden Lakes/UDF III Note and that associated with the Original Southern

Colony/UDF III Note—are *bona fide* commitment fees.

■■■ The next fee to characterize is the extension fee in the amount of $87,345.00 paid in connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]. The extension fee makes up a portion of the face amount of the Amended Southern Colony/UDF III Note [Exhibit No. 14], even though not explicitly mentioned in the text of this Note.[43] However, the Court is persuaded that it is properly characterized as principal for the usury analysis for the same reasons the commitment fees are properly characterized as principal for the usury analysis. Under Texas law, "a contract modification," such as the Amended Southern Colony/UDF III Note [Exhibit No. 14], "must satisfy the traditional requirements of a contract—there must be a meeting of the minds supported by consideration . . . . [w]hen a party agrees to do no more than that which he is already bound to do under an existing contract, the consideration is not sufficient to support a modification." *Arthur J. Gallagher & Co. v. Dieterich,* 270 S.W.3d 695, 702 (Tex.App.-Dallas 2007) (*internal citations omitted*). As far as the Court can tell, there is no other form of consideration provided by Southern Colony in connection with the Amended Southern Colony/UDF III Note [Exhibit No. 14]. Accordingly, it is reasonable to assume that the extension fee in the amount of $87,345.00 was a fee paid in consideration for the amendment of the Original Southern Colony/UDF HI Note [Exhibit No. 14], in which the payment period of the loan was extended. As such, this Court views the extension fee in the amount of $87,345.00 as a *bona fide* extension fee representing separate consideration for the amendment of the Original Southern Colony/UDF III Note [Exhibit No. 14] and the extension of the pay period for the loan governed by the Southern Colony/UDF III Notes [Exhibits No. 3 & 14]. Accordingly, the Court finds that the extension fee in the amount of $87,345.00 is properly characterized as principal for the purposes of the usury analysis.

■■■ The next items to be characterized for the purposes of the usury analysis are the Miscellaneous Fees in the amount of $2,400.00 in connection with the Southern Colony/UDF III Notes. The description of these fees in the Loan History of UDF III on Loan to Southern Colony [Exhibit No. 18] is not helpful in characterizing the fees. Moreover, there is no other evidence in the record which would assist in a characterization. Under Texas law, the party making a claim of usury has the burden of proof. *Ravkind v. Mortgage Funding Corp.,* 881 S.W.2d 203, 205–06 (Tex.App.-Houston [1st Dist.] 1994); *Amaya v. First State Bank of San Diego,* 570 S.W.2d 95, 96 (Tex.Civ.App.-San Antonio 1978). In addition, there is a presumption "that a borrower has received the entire

---

43. The Original Southern Colony/UDF III Note [Exhibit No. 3] has a face value of $1,911,500.00. The Amended Southern Colony/UDF III Note [Exhibit No. 14] has a face value of $2,998,845.00, which, by the express language of this Note, was to "accommodate" the increase to the interest reserve $1,040,000.00. However, the face value of the Original Southern Colony/UDF III Note [Exhibit No. 3], $1,911,500, added to the increase in the interest reserve under the Amended Southern Colony/UDF III Note [Ex- hibit No. 14], *i.e.,* $1,000,000.00 (from $40,000 to $1,040,000.00), results in a sum of $2,911,500.00, which is $87,345.00 less than the face amount of the Amended Southern Colony/UDF III Note [Exhibit No. 14]. This additional amount of $87,345.00 is explained by the Loan History of UDF III on Loan of Southern Colony [Exhibit No. 18], which records a "LOC Ext Fee," in the exact amount of $87,345.00, charged against principal on "08/22/2007."

amount of the principal called for in any note executed by him." *Amaya*, 570 S.W.2d at 96, *quoting* 58 Tex.Jur.2d Usury § 73 (1964). The Court therefore finds that the Plaintiffs have failed to carry their burden of showing that the Miscellaneous Fee should be characterized as interest. The Miscellaneous Fee has been characterized as principal under Texas contract law, and the Plaintiffs have not introduced any evidence tending to show that this fee should be recharacterized. Accordingly, the Court finds that the Miscellaneous Fee should be characterized as principal for the purposes of the usury analysis.

■ Conversely, the Court finds that the administrative fee to UDF III in the amount of $4,115.00 to constitute interest charged in relation to the Original Southern Colony/UDF III Note. Texas law holds that "front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious." *Perry v. Stewart Title Co.*, 756 F.2d at 1206, *citing First State Bank of Bedford*, 563 S.W.2d at 575 (" 'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly in testing for usury.' "), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782–83. In the Original Southern Colony/UDF III Note [Exhibit No. 3], Section 2(b) expressly sets out that the fee is in consideration of "administrative costs and expenses incurred by Lender in connection with Commitment Advances." While it is true that Section 2(b) of the Original Southern Colony/UDF III Note [Exhibit No. 3] goes

on to state that "the Loan Administration fee is fully earned by Lender at the closing of this Note ..." and that "such amount ... shall automatically constitute principal outstanding," the mere characterization of such a fee as principal is not conclusive of how the fee should be characterized in the usury analysis. *See Stedman*, 595 S.W.2d at 488–89; *Delta Enters. v. Gage*, 555 S.W.2d 555 (Tex.Civ.App.-Fort Worth 1977, *writ ref'd n.r.e.*). Texas courts have often held that "courts will look beyond the form of the transaction to its substance in determining the existence or nonexistence of usury." *See Stedman*, 595 S.W.2d at 488–89, *quoting Gonzales County Savs. & Loan Assoc. v. Freeman*, 534 S.W.2d 903 (Tex.1976). In *Stedman*, the Supreme Court of Texas specifically concluded that, for the purposes of the usury analysis, the express language of a contract characterizing a commitment fee as "interest" did not control in finding that a fee was not properly labeled interest according to the substance of the transaction. 595 S.W.2d at 489. This Court is persuaded that, on this relatively sparse record, the substance of the transaction contravenes the express language of the Original Southern Colony/UDF III Note, and instead indicates that the administrative fee paid to UDF III in the amount of $4,115.00 is properly characterized as interest.

The Court reaches this conclusion for two reasons: (1) the express language of this Note specifically states that the fee is "in consideration for administrative costs and expenses incurred by Lender in connection" with the advances under the loan, which closely tracks the language of *Perry v. Stewart Title Co.* in describing the very sort of fees courts are to characterize as interest in the usury analysis;[44] and (2)

---

**44.** *Compare* the language in Section 2(b) of the Original Southern Colony/UDF III Note

[Exhibit No. 3] ("In consideration of administrative costs and expenses incurred by Lender

there is no evidence in the record indicating that the administrative fee was in consideration for any kind of extraordinary or separate administrative actions taken in conjunction with the loans which might substantiate an argument that the administrative fee was in consideration for services separate from the loan, or which might be outside the scope of the "front-end" fees that Texas courts recharacterize as interest. Therefore, the Court finds that the administrative fee to UDF III in the amount of $4,115.00 will be characterized as interest for the purposes of the usury analysis.

The recharacterization of the administrative fee for the usury analysis means that the amount of the fee (*i.e.,* $4,115.00) must be removed from the principal actually advanced under the Southern Colony/UDF III Notes, and added to the interest charged or received under these Notes. The subtraction of the amount of this administrative fee from the principal actually advanced under the Southern Colony/UDF III Notes reduces this principal amount from $1,894,920.00 on the date Perry filed his Chapter 11 petition (*i.e.,* April 11, 2008) to a recharacterized principal amount of $1,890,805.00 (*i.e.,* $1,894,920.00—$4,115.00 = $1,890,805.00). The addition of the amount of this administrative fee increases the interest charged or received under the Southern Colony/UDF III Notes from the amount of $344,202.57 up to the amount of $348,317.57 in recharacterized interest (*i.e.,* $344,202.57 + $4,115.00 = $348,317.57).

In order to determine if these Notes are usurious under this set of circumstances, the Court must first calculate the usury

ceiling for the Southern Colony/UDF III Notes for the recharacterized principal (the Recharacterized Southern Colony/UDF III Usury Ceiling). The Court reaches the Recharacterized Southern Colony/UDF III Usury Ceiling by calculating the portion of the Original Southern Colony/UDF III Usury Ceiling ($384,830.65), as calculated in Section C(ii)(1) of the Conclusions of Law, that can be ascribed to the $4,115.00 Administrative Fee, and then reducing the Original Southern Colony/UDF III Usury Ceiling by this amount, as shown below. The approach to finding the amount the administrative fee contributed to the Original Southern Colony/UDF III Usury Ceiling is identical to the approach to finding the Original Southern Colony/UDF III Usury Ceiling, as explained in Section B(ii)(1), above.

- $4,115.00 (Recharacterized Fee) × 0.18 (Interest Rate Ceiling)
 = $740.70 = (Annual Interest Rate Ceiling)
- $740.70 (Annual Interest Rate Ceiling)/365 (Days)
 = $2.03 (Interest Accrued Per Die m Ceiling)
- $2.03 (Interest Accrued Per Die m Ceiling) × 415 (Days accruing interest)
 = $842.17 (Total portion of the Original Southern Colony/UDF HI Usury Ceiling contributed by the Recharacterized Administrative Fee)

The final step in calculating the Recharacterized Southern Colony/UDF III Usury Ceiling is to reduce the Original Southern Colony/UDF III Usury Ceiling by the portion contributed by the recharacterized fee:

in connection with Commitment Advances, Borrower agrees to pay Lender a Loan Administration Fee") *with Perry v. Stewart Title Co.,* 756 F.2d at 1206 ("Texas courts have held repeatedly that front-end charges paid to

the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note to determine whether a loan is usurious.").

- $384,830.65 (Original Southern Colony/UDF III Usury Ceiling)—$842.17 (Total portion of the Original Southern Colony/UDF III Usury Ceiling contributed by the Recharacterized Administrative Fee)

 = $383,988.48 (Recharacterized Southern Colony/UDF III Usury Ceiling)

As noted above, after recharacterizing the administrative fee, the amount of interest charged or received under the Southern Colony/UDF III Notes [Exhibit No. 3 & 13] is increased by the amount of the administrative fee (*i.e.*, $4,115.00) from $344,202.57 to $348,317.57. This amount is still approximately $35,000.00 less than the Recharacterized Southern Colony/UDF III Usury Ceiling of $383,988.48, calculated above. The Court notes that the interest charged on the recharacterized principal is not usurious, even *without* considering the greater dollar amount which would be allowed to be charged if the Court was to calculate the ceiling for interest compounded monthly, as contracted for in the Southern Colony/UDF III Notes.

In conclusion, the Court finds that no usurious interest was contracted for, charged, or received under the UDF III Notes [Exhibits No. 3, 14, 22, & 40]. Because many of the fees are easily characterized as principal for the purposes of the usury analysis and because there is still a substantial cushion between the amount of recharacterized interest charged and the Recharacterized Southern Colony/UDF III Usury Ceiling, the Court estimates a low chance reaching a different result in a full trial on the merits. However, the Court recognizes that the record is incomplete for certain items that have been characterized, and thus estimates a 5% chance of reaching a different result in a full trial.

*(3) UDF III's various defenses to the Plaintiffs' claims of usury.*

The Defendants have raised the following defenses to the Plaintiffs' claims of usury, as noted above: (1) Perry, as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony are equitably estopped from claiming UDF III contracted for, charged, or received usurious interest; (3) the savings clauses in the UDF III Notes are effective to prevent usurious interest from being contracted for, charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury penalty because setoff requires mutual obligations; and (5) in the alternative, if Perry is entitled to setoff due to usury penalties, the amount of setoff is limited to the amount which would be distributed to Perry due to his equity interest in Perry Properties. The merit, or lack thereof, of these defenses will not change the result the Court has reached based upon the calculations about the absence of usury discussed already herein. Rather, the Court addresses these defenses as an important part of discounting the Plaintiffs' claims based on the percentage chance of reaching a different result in a complete trial. The greater the number of meritorious defenses raised by UDF III, the less likely that this Court's decision that no usury penalty should be applied against Perry's obligations will be discounted. The defenses are addressed in turn.

- *(a) Standing of Perry, as Guarantor, to obtain setoff as a result of usury penalties*

The Defendants contend that Perry, as Guarantor, cannot assert a claim of usury, even if Southern Colony or Hidden Lakes could prove usury under the UDF III Notes; and further, even if Hidden Lakes or Southern Colony do succeed

on their usury claims, Perry is not entitled to setoff for those penalties. Texas law does not allow absolute guarantors to obtain setoff based on usury penalties. *Greenway Bank & Trust of Houston v. Smith,* 679 S.W.2d 592, 595 (Tex.App.-Houston [1st Dist.] 1984) *citing Houston Sash & Door, Inc. v. Heaner,* 577 S.W.2d 217 (Tex.1979). This principle of Texas law has been recognized by the Fifth Circuit, which has stated, "Texas law does not permit a guarantor to escape its obligation by asserting a usury defense based on a usurious principal obligation." *Ginsberg 1985 Real Estate P'ship v. Cadle Co.,* 39 F.3d 528, 534 (5th Cir.1994). The reasons given for precluding guarantors from this defense are two-fold. *Greenway Bank & Trust of Houston,* 679 S.W.2d at 595. First, because the applicable usury statute is penal in nature, "it should be strictly construed to provide relief only 'to immediate parties of the transaction creating the usury defense.'" *Id., quoting Houston Sash & Door, Inc.,* 577 S.W.2d at 222. Second, an absolute guarantor is completely liable on the guaranteed obligation, and is "prohibited from prosecuting an action to recover a usury penalty" under the usury statutes. *Id., quoting Houston Sash & Door, Inc.,* 577 S.W.2d at 222. As a result, an absolute guarantor will not have standing to assert a defense of usury, unless "the guaranty agreement also contains the usurious provision." *Bair Chase Prop. Co.,* 260 S.W.3d at 145. As this Court discusses in Section C(vi) of the Conclusions of Law, *infra,* Perry is an absolute guarantor of the UDF III Notes [Exhibits No. 3, 13, 22 & 40], and Perry thus will not have standing to assert a defense of usury or obtain setoff from usury penalties unless the Notes themselves contain a usurious provision.

On the facts in this dispute, Perry does not have standing to assert a defense of usury, nor is he permitted to obtain setoff resulting from any usury penalties. Neither of the UDF III Guaranty Agreements [Exhibits No. 10 & 25] make any reference to interest at all, let alone specific interest rates which might constitute the "usurious provision" spoken of in *Bair Chase Prop. Co.,* 260 S.W.3d at 145. As a result, the Court finds that the UDF III Guaranty Agreements [Exhibits No. 10 & 25] do not contain a usurious provision. Hence, Perry, as guarantor, does not have standing under Texas law to assert usury as a defense against UDF III. Because Texas law consistently holds that a guarantor has no standing to raise a claim of usury unless the usurious provision is contained in the guaranty agreement itself, and because there is no evidence of any such provision in Perry's UDF III Guaranty Agreements [Exhibits No. 10 & 25], the Court estimates a 0% probability of reaching a different result in a trial on the merits.

● *(b) Equitable Estoppel*

The Defendants contend that the Plaintiffs should be equitably estopped from asserting claims of usury, based on opinion letters prepared by Locke, Liddell, & Sapp, LLP [Exhibit No. 108], and Coats Rose PC [Exhibit No. 109] (together, the Opinion Letters). The Defendants assert that, because the Opinion Letters were prepared and delivered to UDF III by the two law firms, at the request of the Plaintiffs, and because the Opinion Letters contain opinions to the effect that both the Original Hidden Lakes/UDF III Note and the Original Southern Colony Note are not usurious, the Plaintiffs should be equitably estopped from asserting that the Notes are usurious.

The Fifth Circuit recognizes that Texas law generally defines estoppel as "conduct which causes the other party to materially alter his position in reliance

on that conduct." *Monumental Life Ins. Co. v. Hayes–Jenkins*, 403 F.3d 304, 311 (5th Cir.2005). The elements of equitable estoppel are: "(1) a false representation or concealment of material facts made with knowledge (actual or constructive) of those facts, (2) with intention that it should be acted on, (3) to a party without knowledge, or means of knowledge of those facts, (4) who detrimentally relied upon those representations." *Id.* By the Defendants' own admission, Texas courts have imposed greater restrictions on the use of equitable estoppel in the context of usury claims, by adding an additional element that the plaintiff actually participated in the deception on the lender. *Miro v. Allied Fin. Co.*, 650 S.W.2d 938, 944 (Tex.App.—Houston [14th Dist.] 1983); *Am. Century Mortgage Investors v. Reg'l Ctr., Ltd.*, 529 S.W.2d 578 (Tex.Civ.App.-Dallas 1975, *writ ref'd n.r.e.*). The Defendants contend that this extra element is satisfied because Hidden Lakes and Southern Colony directed "their attorneys" to deliver the Opinion Letters to UDF III, and therefore, if the opinions are now disavowed, Hidden Lakes and Southern Colony participated in a deception of UDF III.

■ The Defendants have failed to prove at least the first element required for this Court to equitably estop the Plaintiffs' claims. The first element requires a false representation or concealment of material facts made with actual or constructive knowledge of those facts. The Defendants allege that Southern Colony and Hidden Lakes' misrepresentation or concealment of material facts was the act of having the Opinion Letters delivered on their behalf with actual or constructive knowledge that they would disavow the opinions in the Opinion Letters in the event there was conflict over the UDF III Notes. This argument fails for the reason that there is no evidence in the record indicating that at the time the Opinion Letters were delivered, Hidden Lakes or Southern Colony had any knowledge, constructive or otherwise, that they would later contradict the opinions in the Opinion Letters. Accordingly, the Court cannot find that any misrepresentation or concealment was made with actual or constructive knowledge. Hence, the first element is not met and equitable estoppel is not appropriate.

It is true that in at least one other jurisdiction, Florida, an opinion letter provided by a borrower has been adequate to bar usury claims. *See In re Vision Dev. Group of Broward County*, 411 B.R. 768, 771–72 (Bankr.S.D.Fla.2009). However, this Court notes that the standard for equitable estoppel is different in this jurisdiction—"[e]quitable estoppel requires: (1) acts or conduct by a party causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts or conduct; and (3) detrimental reliance by the other party upon the state of things so indicated." *Id.* Under this standard, it is possible that equitable estoppel might be appropriate on the record before the Court. It is not impossible that this Court could find that the Plaintiffs were at least negligent with respect to whether they would later repudiate the opinions provided in the Opinion Letters. Texas law, however, requires *knowledge* on the part of the party alleging usury, a higher standard which, given the state of the record in the dispute at bar, is not satisfied.

In conclusion, the Court finds that equitable estoppel of the Plaintiffs' usury claims is not appropriate. Because there is not a wealth of case law on the topic of promissory estoppel on the basis of opinion letters, and because the current record is quite sparse with respect to facts salient to this analysis, the Court estimates a 20%

probability of reaching a different result in a full trial on the merits.

● *(c) Effect of the Savings Clause*

▮▮▮▮ The Defendants assert that the savings clauses in each of the UDF III Notes prevent UDF III from contracting for, charging, or receiving usurious interest. The Court has concluded, above, that UDF III has not contracted for usurious interest, but in case this conclusion is incorrect, the Court undertakes the following analysis—which assumes usury has occurred. Under Texas law, "[s]avings clauses are favored by the law and will be given effect if reasonably possible." *Kennon v. McGraw*, 281 S.W.3d 648, 652 (Tex. App.-Eastland 2009); *Woodcrest Assocs., Ltd. v. Commw. Mortgage Corp.*, 775 S.W.2d 434, 437–38 (Tex.App.-Dallas 1989) (*writ den'd*). The effect of a savings clause turns on the construction of the terms of the whole transaction in light of the surrounding circumstances. *Id.* "Usury is a matter of intention, and a savings clause is evidence of an intent not to charge usurious interest." *Kennon*, 281 S.W.3d at 652; *Robert Joseph Phillips Living Trust v. Scurry*, 988 S.W.2d 418, 421 (Tex.App.-Eastland 1999, *pet. denied*). "A party may not, however, escape penalty by disclaiming the intention to do what was clearly done." *Kennon*, 281 S.W.3d at 652; *C & K Invs. v. Fiesta Group, Inc.*, 248 S.W.3d 234, 244 (Tex.App.-Houston [1st Dist.] 2007); *Nevels*, 102 S.W.2d at 1049. The purpose of this rule is to prevent a creditor from freely contracting for usurious interest knowing that for the few debtors who complain, the creditor will escape penalty by mere reference to a savings clause and refund of the usurious amounts. *C & K Invs.*, 248 S.W.3d at 244; *Kaplan v. Tiffany Dev. Corp.*, 69 S.W.3d 212, 220 (Tex.App.-Corpus Christi 2001, *no pet.*) However, if it is reasonably possible to give some effect to the savings clauses,

this Court must interpret them in a manner which would deny the right to collect usurious interest. *Woodcrest Assocs., Ltd.*, 775 S.W.2d at 438; *Nevels*, 102 S.W.2d at 1049.

▮▮▮▮ Texas courts have held that usury savings clauses will not save a usurious transaction when notes are usurious on their face (*i.e.*, the savings clause is directly contrary to the explicit terms of the contract) or when there is no evidence of the lender attempting to effectuate the savings clause. *Armstrong v. Steppes Apartments, Ltd.*, 57 S.W.3d 37, 47 (Tex. App.-Fort Worth 2001). Further, any lender who continues to charge usurious interest after receiving notice that the borrower objects to the charged interest as usurious, will not be protected from a claim of usury by a usury savings clause. *Kennon*, 281 S.W.3d at 652. Finally, lenders who structure transactions in a manner that evinces an intent to charge a usurious amount of interest, and make no effort to effectuate the savings clause will also not be protected by a savings clause. *C & K Invs.*, 248 S.W.3d at 245.

▮▮▮ In view of the preceding law, the loans in question, and the language of each set of Notes as a whole, this Court is persuaded that the usury savings clauses should be given effect, and if the Notes were usurious as contracted for, charged, or received, the Defendants would be protected from usury penalties by these savings clauses. In reaching this conclusion, the Court is persuaded by much the same reasons as the Texas Court of Appeals in *Woodcrest Associates*, which stated:

> From our review of the loan documents, and in particular, the savings clauses, we conclude that the manifest intent of the parties was to structure the entire transaction so as to avoid contracting for, charging, or receiving usurious interest.

The testimony at trial revealed that both parties were well aware of the potential usurious nature of the transaction, especially with regard to the various loan fees. The aggressive draftsmanship of the documents reflects an intent that Commonwealth collect as much of the agreed upon fees as possible without violating the usury laws. Therefore, if at all possible, we must give effect to this intent in the present case.

775 S.W.2d at 438–39.

The UDF III Notes evince a similar intent to structure the transactions in order to avoid contracting for, charging, or receiving usurious interest. The UDF III Notes contain a very careful characterization of various fees as principal rather than interest, and expressly state whenever separate consideration has been provided for these fees.[45] Indeed, the splitting of the Hidden Lakes transaction between two loans—one governed by Texas law and a usury ceiling of 18% *per annum,* and the other governed by Nevada law and not subject to any usury ceiling—evinces an intent to structure the transaction in order to avoid violating usury laws. Finally, savings clauses can be found in at least three places in both the Original Hidden Lakes/UDF III Note [Exhibit No. 22] and the Original Southern Colony Note [Exhibit

No. 3].[46] As such, it is proper for the Court to find that the savings clauses have legal effect and preclude UDF III from usury penalties resulting from the UDF III Notes.[47] On the other hand, because this Court assumes that usury has occurred (for the purposes of this subsection only), it is possible that this Court would conclude, after a complete trial, that UDF III's lack of action to correct the problem constituted proof of intent to charge or receive usurious interest. Accordingly, this Court estimates a 20% probability of reaching a different result in a full trial on the merits.

### iii. Should the Court equitably subordinate the claims of UDF III?

The Plaintiffs contend that UDF III, in conjunction with UDF, has engaged in inequitable conduct as an "insider" which has resulted in injury to Perry's creditors or conferred an unfair advantage to UDF III.

 Pursuant to Section 510(c) of the Code, this Court has the power to "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another

---

45. *See, e.g.,* the Original Southern Colony/UDF III Note [Exhibit No. 3] § 2(b); § 2(c).

46. *E.g.,* in the Original Southern Colony/UDF III Note [Exhibit No. 3]: *"Base Rate'* shall mean the lesser of (i) fifteen percent (15.0%), accrued and compounded monthly, or (ii) the Highest Lawful Rate." [§ 1]; "if any fees or expenses charged or chargeable to Borrower hereunder are determined to constitute interest, and such fees or expenses, when added to the interest charged hereunder, would cause the aggregate interest charged hereunder to exceed the Highest Lawful Rate, then Section 11 of this Note shall automatically apply to reduce the interest charged hereunder. ...." [§ 2(d) ]; "this Note shall never bear interest

in excess of the Highest Lawful Rate, and (ii) if at any time the rate at which interest is payable on this Note is limited by the Highest Lawful Rate .... then this Note shall bear interest at the Highest Lawful Rate" [§ 4(b) ].

47. Because UDF III charged and received interest pursuant to the UDF III Notes containing the savings clauses, it will not be liable for usury penalties resulting from charging or receiving those amounts, so long as whatever interest above and beyond the legal limit is returned to Hidden Lakes or Southern Colony. *See C & K Invs.,* 248 S.W.3d at 244; Tex. Fin.Code Ann. § 305.101 (Vernon 2009).

allowed interest." 11 U.S.C. § 510(c) (2006). Equitable subordination has been recognized as "an unusual remedy which should be applied only in limited circumstances." *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1466–1467 (5th Cir.1991) *citing Holt v. FDIC (In re CTS Truss, Inc.)*, 868 F.2d 146, 148–49 (5th Cir.1989). Furthermore, the doctrine of equitable subordination is "remedial, not penal, and should be applied only to the extent necessary to offset the specific harm that the creditors suffered on account of the inequitable conduct." *Matter of Fabricators, Inc.*, 926 F.2d at 1466–1467.

■ The Fifth Circuit has laid out a three-pronged test to determine "whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some sort of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 697 (5th Cir.1990) *citing Matter of Missionary Baptist Found., of Am., Inc.*, 796 F.2d 752, 760 (5th Cir. 1986). In the event that all three prongs are satisfied, the Court is *permitted*, but *not required*, to subordinate a claim. *Matter of Fabricators, Inc.*, 926 F.2d at 1464–65 n. 9. The Fifth Circuit unequivocally requires that, when a bankruptcy court subordinates a claim, the determination "must be supported by specific findings and conclusions with respect to each requirement." *In re SI Restructuring, Inc.*, 532 F.3d 355, 361–64 (5th Cir.2008), *citing In re Fabricators*, 926 F.2d at 1465. This Court's analysis of the three prongs follows below.

*(1) The first prong: inequitable conduct of the claimant*

■ The *Clark Pipe* Court went on to state that three types of conduct "have been recognized as sufficient to satisfy the first prong of the three part test: (1) fraud, illegality, or breach of fiduciary duties; (2) undercapitalization; and (3) a claimant's use of the debtor as a mere instrumentality or alter ego." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 697. The Plaintiffs have made no allegations of undercapitalization, so this Court instead focuses on (1) fraud, illegality, or breach of fiduciary duties, and (3) claimant's use of the debtor as a mere instrumentality or alter ego in analyzing the first prong of the three prong test.

■ In order to use an entity as a mere instrumentality or alter ego, a creditor must have "actual, participatory, total control of the debtor." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 699, *quoting Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1105 (5th Cir.1973), *modified factually*, 490 F.2d 916 (5th Cir.1974) *(elaborated in Valdes v. Leisure Res. Group*, 810 F.2d 1345, 1354 (5th Cir.1987)).

■ The facts currently on the record lead the Court to find that equitable subordination is not proper for the claims of UDF III. Though, from the record, it appears that after Perry filed his Chapter 11 petition, UDF (and perhaps UDF III) became somewhat more involved in completing the Hidden Lakes Property than it was prior to the filing of Perry's petition, it by no means appears that this behavior rose to the level of "actual, participatory, total control of the debtor." The Fifth Circuit has held that "[m]erely taking an active part in the management of the debtor corporation does not automatically constitute control … by the creditor corporation." The evidence on the record before this

Court probably does not even establish that UDF or UDF III took an "active part in the management" of Hidden Lakes, and in no case can it be concluded from the record that UDF and UDF III exceeded this standard. The majority of UDF and UDF III's actions (if UDF III can be considered to have taken any action at all) were directed toward oversight of the completion of construction on the Hidden Lakes Property to a point where it was commercially viable. [Finding of Fact No. 21.] These actions seem to be nothing more than a "large creditor, ... interested in the prosperity of the company," who "most naturally should desire to keep an oversight over its doings." *Krivo Indus. Supply Co.*, 483 F.2d at 1105, *quoting Chi. Mill & Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir.1916).

Nor does there appear to be any "fraud, illegality, or breach of fiduciary duties." There has been no allegation by the Plaintiffs that the foreclosure sale of the Hidden Lakes Property violated the requirements of Texas law; UDF III never owed Hidden Lakes any fiduciary duties; and although the Plaintiffs hint at collusion between UDF and the purchaser at the foreclosure sale, no fraud has been directly alleged. As such, the first prong of the three-part test is not satisfied.

*(2) The second prong: Claimant's misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.*

The Fifth Circuit has stated "that in the absence of actual harm, equitable subordination is inappropriate." *In re SI Restructuring, Inc.*, 532 F.3d at 361, *citing In re Mobile Steel Co.*, 563 F.2d 692, 701, 706 (5th Cir.1977). This rule has been interpreted by the Fifth Circuit to be synonymous with the statement that "the of-

fending party's claim will be subordinated only to those who can show actual injury." *In re SI Restructuring, Inc.*, 532 F.3d at 361, *quoting* 4 COLLIER ON BANKRUPTCY ¶ 510.05[3][e].510–31 (15th ed. revised). On account of these mandates, this Court discerns no avenue for the Plaintiffs to satisfy the second prong of the test. The Plaintiffs do not assert, except in the broadest terms possible, actual injury to Perry or Perry's creditors resulting from the acts of UDF and UDF III. Moreover, there is no evidence before the Court tending to show that the alleged bad acts of UDF and UDF III caused actual injury to Perry or Perry's creditors, or conferred any kind of unfair advantage on the claimants (*i.e.*, UDF and UDF III). On the contrary, as already noted, the majority of UDF and UDF III's actions (again, if UDF III can be considered to have taken any action at all) appear to be directed toward completing construction on the Hidden Lakes Property to a point where it was commercially viable, which could be of benefit to Perry and his other creditors. In any event, the Plaintiffs have the burden of showing either actual injury to Perry's creditors or unfair advantage to UDF and UDF HI, and they have failed to prove either. Therefore, the second prong of the three-part test is also not satisfied.

*(3) The third prong: equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.*

The Code confers an equity jurisdiction upon the bankruptcy courts. *In re Tex. Consumer Fin. Corp.*, 480 F.2d 1261, 1265 (5th Cir.1973). But this jurisdiction "merely empowers the Referee to employ the principles of equity in the exercise of his statutory jurisdiction." *Id.* The "[J]urisdiction of the Bankruptcy Court is framed by statute according to the particular proceeding involved under the Bank-

ruptcy Act, and the Bankruptcy Court's exercise of its equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act." *Id.* "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." *In re Sunbeam Corp.,* 284 B.R. 355, 364 (Bankr.S.D.N.Y. 2002). Insofar as the Court has already concluded that the first two prongs of the test have not been satisfied, the Court sees no reason to address whether the third element could be met. For all of these reasons, the Court concludes that the claims of UDF III should not be equitably subordinated.

*(4) Defenses to equitable subordination asserted by the Defendants*

The Defendants have asserted that equitable subordination is improper because (1) the conduct of which the Plaintiffs complain was directed against Hidden Lakes, not Perry (*i.e.* the Debtor); and (2) the Code does not allow the subordination of UDF III's claim to Perry's equity interest, such as it is. Without ruling directly on the first argument, this Court agrees with the Defendants that it does not have the power to subordinate UDF III's claim to Perry's equity interest. Under the express language of 11 U.S.C. 510(c), the Court may not subordinate a claim to an equity interest; it may only subordinate one claim to another claim and one equity interest to another equity interest. *In re C.R. Amusements, LLC,* 259 B.R. 523, 529 (Bankr.D.R.I.2001).

*(5) Conclusion: equitable subordination is not proper.*

Considering that the Plaintiffs have failed to satisfy the first two prongs of the test by a good measure, the Court finds that equitable subordination is not proper and estimates a 0% probability of reaching a different result in a full trial on the merits. Thus, the Court will not discount the claims of UDF III on this basis.

*iv.* *Does Perry have a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property?*

The Plaintiffs contend that Perry, as guarantor of the loan between UDF III and Hidden Lakes, is entitled to a setoff under Tex. Prop.Code § 51.003 because the fair market value of the Hidden Lakes Property on the date of the foreclosure sale was in excess of the sale price.

However, this section does not apply to UDF III because UDF III does not seek a deficiency judgment against Hidden Lakes or Perry. UDF III had no relation to the foreclosure sale under the Deed of Trust because it was never a lienholder on the Hidden Lakes Property. Under Texas law, a deed of trust is simply a mortgage with a power of sale. *In re Rangel,* 408 B.R. 650, 656 n. 1 (Bankr. S.D.Tex.2009); *Starcrest Trust v. Berry,* 926 S.W.2d 343, 351 (Tex.App.-Austin 1996). An adequate description of the property subject to the mortgage or deed of trust is necessary for the validity of a mortgage or deed of trust. *Stone v. Williams,* 358 S.W.2d 151 (Tex.Civ.App.-Houston 1962). The UDF Deed of Trust [Exhibit No. 29] which provided for the foreclosure sale of the Hidden Lakes Property was held by UDF alone, as noted above, in section C(i) of the Conclusions of Law. UDF III *is* secured under the Hidden Lakes/UDF III Notes by the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] which does not contain any description of the Hidden Lakes Property. As such, the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] is inade-

quate to create a mortgage or a deed of trust under Texas law.

The Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] *is* adequate to create a security interest under Title 1, Chapter 9 of the Texas Business and Commerce Code (Chapter 9 of the Uniform Commercial Code) pursuant to language in this Security Agreement expressly granting a "continuing security interest ... in all assets" held by Hidden Lakes and Hidden Lakes GP. *See* Tex. Bus. & Com.Code § 9.203 (Vernon 2009). However, a security interest created under Chapter 9 of the Uniform Commercial Code may not include liens on real property (with some small exceptions that are inapplicable to the matter before the Court). *Id.* § 9.109(d)(11). Thus, (1) UDF III was not a party to the UDF Deed of Trust, (2) the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] is neither a mortgage nor a deed of trust under Texas law; and (3) the Hidden Lakes/UDF III Security Agreement [Exhibit No. 23] *cannot* grant a lien on the Hidden Lakes Property under Chapter 9 of the Uniform Commercial Code. Accordingly, UDF III has no interest in the Hidden Lakes Property which could give rise to a deficiency judgment. For the Court to find otherwise would be the functional equivalent of allowing the holder of a security interest in a debtor's car to bring a deficiency action on that same debtor's home. For these reasons, Perry is not entitled to any credits against the claims of UDF III due to the foreclosure sale of the Hidden Lakes Property. As the Court is not aware of any case law tending to indicate that a claim against a guarantor such as Perry is a deficiency action that is potentially subject to setoff under the Texas Property Code, the Court estimates a 0% probability of reaching a different result in a full trial on the merits.

*v. Should UDF III's claims be disallowed because they are contingent or unliquidated?*

The Plaintiffs also argue that UDF III's claims are contingent, as the loans were not in default on the date of the filing of Perry's bankruptcy petition. Therefore, the determination of the amount of UDF III's claims is ongoing and still contingent and unliquidated as to Perry's guarantees. The Plaintiffs then argue that the fixing or liquidation of these contingent claims would unduly delay the administration of Perry's Chapter 11 case, and thus request that the claims be disallowed.

■■■ Courts, particularly bankruptcy courts, fix or liquidate contingent claims quite frequently. As stated by one bankruptcy court: "A guaranty is a classic example of a contingent obligation ... [c]ontingent obligations are allowable and entitled to estimation...." *Matter of Fox,* 64 B.R. 148, 153 (Bankr.N.D.Ohio 1986). Furthermore, the public policy underlying claims estimation under the Code is to facilitate the timely administration of the case by making an expeditious assessment of the value of certain claims which would otherwise unduly delay administration. Section 502(c) provides that contingent or unliquidated claims which would unduly delay the administration of the case shall be estimated by this Court. 11 U.S.C. § 502(c) (2006). Contingent claims such as those held by UDF III are exactly the type of claims an estimation hearing is meant to handle.

*vi. Should the Court consider the ability of the borrower to pay the obligation in estimating the dollar amount of Perry's Guarantees?*

The Plaintiffs argue that in estimating the amount Perry owes under his guarantees, the Court should take into account

the ability of the primary obligor to pay the obligation.

■■■ Courts have much latitude in estimating a guaranty claim. The Bankruptcy Code provides no guidance on how a Court should estimate claims which are contingent or unliquidated. *Matter of Fox,* 64 B.R. at 153. In making an estimation of a claim, the Court "should use whatever method is best suited to the circumstances of the case." *In re Mona Lisa at Celebration, LLC,* 410 B.R. 710, 717 (Bankr.M.D.Fla.2009), *citing Bittner,* 691 F.2d at 136. So this Court is certainly permitted, under the Code, to consider the ability of the principal obligor to pay the obligation. Moreover, there is case law supporting this approach. In *Matter of Fox,* the court noted that "[i]n estimating a guaranty claim, the court should take into account the ability of the primary obligor to pay the obligation . . . . [t]his involves looking at the assets and liabilities of the obligor and the value of property securing the lender's debt." 64 B.R. at 153 *citing In re Zucker* 5 BCD 433 (Bankr.S.D.N.Y. 1979).

■■■ However, under Texas law, a guaranty of payment is "absolute rather than conditional, primary rather than secondary, and guarantees of payment rather than guarantees of collection." *Universal Metals & Mach., Inc. v. Bohart,* 539 S.W.2d 874, 877–78 (Tex.1976). Under Texas law, "one who guarantees payment of a note and waives the requirement that the holder of the note exhaust its rights against the maker, becomes an absolute guarantor." *Greenway Bank & Trust of Houston,* 679 S.W.2d at 595; *Universal Metals & Mach., Inc.,* 539 S.W.2d at 876–78. The lender may bring an action against the absolute guarantor without joining the principal obligor. *Ferguson v. McCarrell,* 582 S.W.2d 539, 541–42 (Tex.

Civ.App.-Austin 1979, *writ ref'd n.r.e.,* 588 S.W.2d 895 (Tex.1979) (*per curiam*)). Thus, if Perry's guarantees are guarantees of payment, then UDF III may bring an action against him without joining either Hidden Lakes or Southern Colony. Under these circumstances, the Court would not look to the ability of any principal obligor in estimating the amount of any claim against Perry based on his guarantees.

■ The facts in this dispute indicate that Perry's guarantees to UDF III are guarantees of payment. The identical language of the UDF III Guaranty Agreements [Exhibits No. 10 & 25] makes this conclusion abundantly clear: "[e]ach Guarantor hereby absolutely and unconditionally guarantees, and becomes surety for, the full, timely and complete payment when due . . . ." The UDF III Guaranty Agreements [Exhibits 10 & 25] further provide that "[e]ach Guarantor's obligation under this Guaranty is unconditional, absolute and enforceable, irrespective of . . . whether recovery against Borrower with respect to the Guaranteed Obligations in whole or in part is prevented by bankruptcy, operation of law, or otherwise . . . ." Finally, the UDF III Guaranty Agreements [Exhibits 10 & 25] include an express waiver of the requirement that the holder of the note exhaust its rights against the maker, stating that the "[l]ender may, in its sole discretion and without notice, take or refrain from taking any action that might otherwise be deemed a legal or equitable release or discharge of Guarantors' obligations under this Guaranty, without either impairing or affecting the joint and several liability of Guarantors for the full, timely and complete payment of the Guaranteed Obligations, which actions might include, by way of illustration and not limitation: . . . (c) the absence of any attempt

to collect the Guaranteed Obligations from Borrower or any other person or entity primarily or secondarily liable for the Guaranteed Obligations or any other action to enforce Lender's rights with respect to the Guaranteed Obligations." Accordingly, the Court recognizes Perry as an absolute guarantor, and will not look to the ability of the primary obligors to pay in estimating the claims against him.

■ Texas law is very clear that a creditor need not first attempt to collect from the borrower or other principal obligor before seeking payment from a guarantor of payment. The UDF III Notes are exceedingly clear in stating that UDF III need not attempt to collect from the borrowers on the Notes before seeking payment from Perry. Accordingly, the Court estimates a 0% probability of reaching a different result in a full trial on the merits.

### vii. Is Proof of Claim 45 Duplicative of Proof of Claim 43?

At the Hearing, the Plaintiffs contended that Proof of Claim 45 is a duplicate of Proof of Claim 43.

Bankruptcy Rule 3001(a) states that "A proof of claim is a written statement *setting forth a creditor's claim.*" Bankr.R. 3001(a). Rule 3001(b) requires that "[w]hen a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim." Bankr.R. 3001(b). Code Section 502(a) states that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed unless a party in interest . . . objects." 11 U.S.C. § 502(a) (2006). Section 502(b) holds that when there is an objection to a claim, the Court "shall determine the amount of such claim . . . and

shall allow such claim in such amount." *Id.* § 502(b).

The Court has estimated that UDF III has aggregate maximum claims of $3,404,280.97 under the Hidden Lakes/UDF III Notes and $2,151,557.80 under the Southern Colony/UDF III Notes as shown in Table 4, *supra.* UDF III has filed three proofs of claim: Proof of Claim 43, 45, and 46. The estimated amount of UDF III's claim under the Hidden Lakes/UDF III Notes corresponds closely with the amount requested in Proof of Claim number 43—*i.e.,* $3,619,902.00. Proof of Claim 43 has attached documents summarizing the loan history between Hidden Lakes and UDF III as well, so it is reasonable to conclude that Proof of Claim 43 is a claim for the amount owed under the Hidden Lakes/UDF III Notes. The estimated amount of UDF III's claim under the Southern Colony/UDF III Notes corresponds closely with the amount requested in Proof of Claim 46—*i.e.,* $2,177,260.03. Proof of Claim 46 has attached documents summarizing the loan history between UDF III and Southern Colony, so it is reasonable to conclude that Proof of Claim 46 is a claim for the amount owed under the Southern Colony/UDF III Notes. There are no other promissory notes in contention between UDF III and the Plaintiffs that correspond with Proof of Claim 45. Moreover, Proof of Claim 45 is identical in all respects to Proof of Claim 43, including attached documents. Because there is no additional documentation for a debt owed to UDF III beyond those supporting Proofs of Claim 43 and 46, and because all evidence indicates that Proof of Claim 45 is an exact copy of Proof of Claim 43, the Court finds that Proof of Claim 45 should be disallowed. The weight of the evidence on this issue is such that the Court estimates a 0% chance of changing

its conclusion after conducting a complete trial.

### viii. Conclusion: Estimated Claims of UDF III

The Court has estimated UDF III's threshold claim under the Hidden Lakes/UDF III Notes to be $3,404,280.97, and under the Southern Colony/UDF III Notes to be $2,151,557.80, for an aggregate threshold claim of $5,555,838.77. The Court has found that it is improper to reduce this aggregate threshold claim on the basis of the Plaintiffs' legal grounds of (1) usury; (2) equitable subordination; (3) right to credits as a result of the foreclosure sale of the Hidden Lakes Property; (4) unliquidated claims; or (5) ability of the borrower to pay the obligation. The Court has also found that Proof of Claim 45 is duplicative of Proof of Claim 43, and accordingly concludes that Proof of Claim 45 should be disallowed in its entirety.

The Court has estimated a 5% probability of reaching a different result in a full trial on the sub-issue of whether usurious interest was charged or received under the UDF III Notes when various fees are recharacterized as interest. This would usually entail some form of discount of UDF III's claims in the amount of 5% of the penalty the Court estimates would be assessed under Texas law. But this is unnecessary, because the Court has found that Perry has no standing to assert a defense of usury or obtain setoff from usury penalties under Texas law. Furthermore, this Court has estimated a 0% probability of reaching a different result in a full trial on the issue of Perry's standing to assert usury or obtain setoff from usury penalties. Perry's inability to obtain setoff from any usury penalties means that no reduction to UDF III's claims can result from a usury defense. As a result, the Court will not discount UDF III's claims on the basis of the probability of reaching a different result on the recharacterized interest sub-issue.

The Court has estimated the likelihood of reaching a different result on the Plaintiffs' other legal grounds at 0%. Accordingly, for purposes of the plan confirmation hearing to be held in the main case, the Court estimates that UDF III's claim under the Hidden Lakes/UDF III Notes to be $3,404,280.97, and under the Southern Colony/UDF III Notes to be $2,151,557.80, for a total claim of $5,555,838.75. The results of this analysis are summarized in Table 6, below.

*Table 6*

| Applicable Notes | Claim before discount | Discount for probability of reaching a different conclusion in a full trial on the merits | Net Claim |
|---|---|---|---|
| Hidden Lake/UDF III Notes | $3,404,280.97 | $ 0 | $3,404,280.97 |
| Southern Colony/ UDF III Notes | $2,151,557.80 | $ 0 | $2,151,557.80 |
| **Both Sets of Notes** | | | $5,555,838.77 |

## D. Conclusions of Law pertaining to the Loans made by UDF

*i. What is the Proper Amount of Proof of Claim 44?*

The first step in the analysis is to determine the initial proper amount of UDF's claim under Proof of Claim 44 before any reduction due to legal grounds raised by the Plaintiffs. Three issues must be addressed: (1) whether UDF is entitled to post-petition interest and costs; (2) the amount of principal actually advanced on the loans; and (3) the amount of interest due on the amount of principal actually advanced. The Court addresses each in turn.

*(1) Is UDF entitled to post-petition interest and costs on the Hidden Lakes/ UDF Note?*

The Bankruptcy Code is very clear on when creditors are entitled to post-petition interest and costs. Section 506(b) provides that "to the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable costs or charges...." 11 U.S.C. § 506(b) (2006). The definition of a "secured claim" is provided in Section 506(a)(1), which provides that "[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." *Id.* § 506(a)(1). Section 506(a)(1) goes on to state that an allowed claim "is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such secured claim." *Id.* Finally, and importantly for the analysis here, Section 502(b) provides that a creditor is not entitled to "unmatured interest" on an unse-

cured claim. *Id.* § 502(b). Thus, the initial inquiry is to determine the value of the estate's interest in the collateral securing the Hidden Lakes/UDF Note in order to determine the amount, if any, of UDF's secured claim. If the value of the estate's interest in the collateral is greater than the amount of UDF's claim, then UDF is entitled to post-petition interest and costs up to the point that total principal plus interest and costs is equal to the amount of the estate's interest in the collateral. If the value of the estate's interest in the collateral is less than the amount of UDF's claim, then some portion of UDF's claim will be an unsecured claim, and UDF will not be entitled to post-petition interest and costs.

■ Given the record before this Court, UDF is not entitled to post-petition interest and costs, and the value of the estate's interest in the collateral should be valued at zero dollars. As noted above, to be counted towards a secured claim, collateral securing a debt must be in the bankruptcy estate—*i.e.,* Perry, as the Debtor–in–Possession, must have had an interest in the collateral at the time of filing. Here, Perry had no interest in any of the collateral securing the Hidden Lakes/UDF Note under the Deed of Trust [Exhibit No. 29], the Hidden Lakes/UDF Security Agreement [Exhibit No. 30] or the Hidden Lakes/UDF Pledge Agreement [Exhibit No. 31]. Therefore, the value of his estate's interest in the collateral must be valued at zero dollars. As a result, UDF has an unsecured claim and it is not entitled to receive post-petition interest or costs.

*(2) What is the dollar amount of principal actually advanced by UDF under the Hidden Lakes/UDF Note?*

Neither party contends that the full face principal value of the Hidden Lakes/UDF

Note was advanced, but there is disagreement over the amount actually advanced. The Plaintiffs contend that the face principal value of the of the Hidden Lakes/UDF Note was reduced by the following amounts: (a) an "interest reserve" in the amount of $1,100,000; (b) a one-half share of a "commitment fee" paid to UMTH in the amount of $37,875.00 (the full amount of the fee being $75,750.00); and (c) a "2% consulting fee" of $28,500.00 to Winchester Equities, LLC. All of these reductions are taken directly from items on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. The Plaintiffs therefore assert that these reductions bring the actual principal advanced on the Hidden Lakes/UDF Note to $1,434,375.00, down from a face value of $2,600,750.00. Because the Plaintiffs argue that UDF contracted for, charged, or received usurious interest under the Hidden Lakes/UDF Note, and Texas usury law may require a recharacterization of certain fees as interest, these contentions entail two separate characterizations of these fees by the Court:[48] First, the Court characterizes these fees under Texas contract and applicable non-usury finance law in order to determine UDF's maximum allowable claim under the contract alone; and second, the Court determines whether these fees should properly be characterized as interest under usury law in determining whether the interest contracted for, charged, or received under the Hidden Lakes/UDF Note was in excess of the legal limit. In this section, the Court characterizes the fees under Texas contract law in order to determine the amount of principal actually advanced. The fees are characterized for the usury analysis below, in Section D(ii) of the Conclusions of Law.

The Defendants, in their Brief of November 11, 2009 [Main Case Docket No. 738], simply make a blanket request that the claims asserted under the Proofs of Claim be allowed in their full amounts. In so doing, the Defendants do not specify an amount advanced as principal, and instead appear to rely on the Hidden Lakes/UDF Note [Exhibit No. 28] and the Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] for the principal actually advanced. The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] indicates a disbursement of funds to Hidden Lakes on May 22, 2007 in the amount of $1,425,000.00. This is the amount listed as the "Commitment" in the Hidden Lakes/UDF Note [Exhibit No. 28]. The loan history documents do not indicate how this number was derived, but the Court will assume that this number represents the full principal face value of $2,600,750.00, reduced by the interest reserve of $1,100,000.00 and the full commitment fee paid to UMTH of $75,750.00, which results in the amount of $1,425,000.00 stated on the loan history.

48. *See Perry v. Stewart Title Co.*, 756 F.2d at 1206 ("Texas courts have held repeatedly that front-end charges paid to the lender for initiating a loan or processing the requisite papers should be deducted from the face amount of the note *to determine whether a loan is usurious.*") *citing First State Bank of Bedford*, 563 S.W.2d at 575 (" 'In cash loan transaction from which the lender deducts interest, fees, commissions or other front-end charges, the amount of dollars actually received or retained by the borrower is held to be the "true" principal. In such cases the amount of the stated principal is reduced accordingly *in testing for usury.'* "), *quoting Tanner Dev. Co.*, 561 S.W.2d at 782–83 Even if the Court finds that usurious interest is contracted for, charged, or received, the Hidden Lakes/UDF Note remains valid and enforceable by UDF, "provided allowance is made for the penalty." *Vordenbaum*, 611 S.W.2d at 465, *citing Wall*, 526 S.W.2d at 151–52, *rev'd on other grounds*, 533 S.W.2d 918 (Tex.1976). Finally, Texas law requires no forfeiture of principal for usurious interest for commercial loans. Tex. Fin.Code § 305.001(a–1) (Vernon 2009).

By implication, the Court assumes that both parties agree that the interest reserve of $1,100,000.00 does not represent principal actually advanced (pursuant to the express language of this Note) and that at least the $1,434,375.00 of principal was actually advanced (as conceded by the Plaintiffs). The next step in the analysis is the characterization of the two disputed items: (1) the one-half share of a commitment fee paid to UMTH costing $37,875.00 (the full amount of the fee being $75,750.00); and (2) the 2% consulting fee of $28,500.00 to Winchester Equities, LLC.

■ As the Court explains in greater detail in section D(ii) of the Conclusions of Law, the Hidden Lakes/UDF Note [Exhibit No. 28] is governed by Nevada law. Under Nevada law, "when a contract is clear on its face, it 'will be construed from the written language and enforced as written.' ... [t]he court has no authority to alter the terms of an unambiguous contract." *Canfora v. Coast Hotels & Casinos, Inc.*, 121 Nev. 771, 121 P.3d 599, 603 (2005). Accordingly, if the Hidden Lakes/UDF Note's [Exhibit No. 28] characterization of an item is clear on its face, this Court must follow that characterization and only resort to the canons of construction or extrinsic evidence when the Hidden Lakes/UDF Note [Exhibit No. 28] is ambiguous. Each item is addressed in turn.

■ The first item to be characterized is the one-half share of a commitment fee paid to UMTH in the amount of $37,875.00 (the full amount of the fee being $75,750.00). Under the Hidden Lakes/UDF Note [Exhibit No. 28], a commitment fee in the amount of $75,750.00 is contemplated at Section 2(c)—"Loan Expenses; Fees—Commitment Fee." This paragraph clearly characterizes the commitment fee as principal. In plain language, it states that "Borrower agrees that such amount *shall automatically constitute principal*

outstanding hereunder and caused [*sic*] *a corresponding increase in the aggregate outstanding amount of Borrower's obligations hereunder.*" Furthermore, the amount listed as paid to UMTH in item 807 of Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35] is also listed as the UDF commitment fee at item 104. As such, the Court finds that the commitment fee paid to UMTH/UDF in the amount of $75,750.00 is properly characterized as principal actually advanced as the Commitment Fee under the Hidden Lakes/UDF Note [Exhibit No. 28]; therefore, the one-half share in the amount of $37,875.00 was improperly removed by the Plaintiffs.

■ The second item to be characterized is the 2% consulting fee of $28,500.00 to Winchester Equities, LLC. This fee is item 805 on the Settlement Statement for Purchase of the Hidden Lakes Property [Exhibit No. 35]. Item 805 on a HUD Settlement Statement is used to itemize inspections done at the request of the lender, so the Court will assume this fee represents a payment to an inspector of the Hidden Lakes Property. As with the commitment fee above, the Hidden Lakes/UDF Note [Exhibit No. 28] clearly contemplates such fees. Section 2(a) states that "Borrower will pay all reasonable costs and expenses and reimburse Lender for any and all expenditures ... in connection with any of the following: (i) ... the closing ... of any loan or creditor facility represented by or secured by the Loan Documents, including ... inspection services and disbursements." Unlike the language in Section 2(c) of the Hidden Lakes/UDF Note [Exhibit No. 28] (concerning the commitment fee), this paragraph does not specifically designate such expenses as principal. But Section 2(f)—"Loan Expenses; Fees—Advance of Certain Fees"—clearly contemplates the payment

of such fees by advances out of the Commitment of $1,425,000.00. Therefore, the Court finds that the 2% consulting fee of $28,500.00 to Winchester Equities, LLC constitutes principal actually advanced as part of the Commitment under the Hidden Lakes/UDF Note [Exhibit No. 28].

To reach the final tally for principal actually advanced under the Hidden Lakes/UDF Note [Exhibit No. 28], the Court starts with the amount disbursed on May 22, 2007—*i.e.*, $1,425,000.00. This amount was actually advanced according to the Loan History [Exhibit No. 36], and corresponds to the principal portion of the Commitment as designated in the Hidden Lakes/UDF Note [Exhibit No. 28]. The $1,425,000.00 is not reduced by any fee, but is partially composed of the 2% consulting fee of $28,500.00 to Winchester Equities, LLC, as designated under the Hidden Lakes/UDF Note [Exhibit No. 28]. The Court then adds the full amount of the $75,750.00 commitment fee to UMTH. This is a separate component of principal, designated as the Commitment Fee under the Hidden Lakes/UDF Note [Exhibit No. 28]. The facts in this dispute indicate that each of these components was actually advanced. These two separate components of principal—the Commitment and the Commitment Fee—are combined by the Court to determine the total amount of principal actually advanced under the Hidden Lakes/UDF Note [Exhibit No. 28]. This combination provides an aggregate sum total of principal advanced under the Hidden Lakes/UDF Note [Exhibit No. 28] of $1,500,750.00.

*(3) What is the dollar amount of interest due on the principal actually advanced under the Hidden Lakes/UDF Note?*

The accuracy of the Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] has not been contested, and it, along with the Settlement Statement for Purchase of Hidden Lakes Property [Exhibit No. 35], is the only record of the transactions that occurred in connection with the loan transaction. As such, the Court will assume the Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] to be an accurate statement of the interest charged (all interest that matured on this Note), and the interest still due on the Hidden Lakes/UDF Note [Exhibit No. 28], for the purposes of this claims estimation procedure to the extent that it is not contradicted by other evidence in the record. As noted above, UDF is not entitled to post-petition interest, so the Court need only calculate interest up to the date Perry filed his Chapter 11 petition (*i.e.,* up to April 11, 2008). The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] gives the dollar amounts of interest accrued each month up to April 1, 2008 as shown in Table 7, below. The Loan History of UDF on Loan of Hidden Lakes [Exhibit No. 36] does not indicate any payments made by Hidden Lakes; thus, all interest charged is also interest still due under the Hidden Lakes/UDF Note [Exhibit No. 28]. The interest accrued between April 1, 2008 and April 11, 2008, and the aggregate interest accrued up to the date Perry filed his Chapter 11 petition, April 11, 2008, is also shown in Table 7, below.

*Table 7*

| Due Date | Interest Accrued since Last Due Date[49] |
| --- | --- |
| June 1, 2007 | $ 12,493.15 |
| July 1, 2007 | $ 37,835.61 |
| August 1, 2007 | $ 40,133.77 |
| September 1, 2007 | $ 41,224.53 |

49. Interest accrues based on a 365-day year.

| October 1, 2007 | $ 40,978.96 |
| November 1, 2007 | $ 43,458.66 |
| December 1, 2007 | $ 43,201.35 |
| January 1, 2008 | $ 45,816.58 |
| February 1, 2008 | $ 47,061.79 |
| March 1, 2008 | $ 45,222.08 |
| April 1, 2008 | $ 49,569.89 |

| Date Perry Filed his Ch. 11 Petition | Interest accrued since last due date |
| April 11, 2008 | $ 16,430.25 |
| **Sum Total of interest:** | **$463,426.62** |

**The sum of these amounts represents the amount of interest properly due under this Note. As such, the Court finds that $463,426.62 has accrued under the**

Original and Amended Hidden Lakes/UDF Notes as of April 11, 2008.

*(4) Conclusion: What is the threshold amount of UDF's Claims under the Hidden Lakes/UDF Note?*

The Court has found that the total principal actually advanced under the Hidden Lakes/UDF Note [Exhibit No. 28] is $1,500,750.00. The Court has also found the total amount of interest due under the Hidden Lakes/UDF Note [Exhibit No. 28] to be $463,426.62. This results in total maximum claim of $1,964,176.62 for UDF under the Hidden Lakes/UDF Note [Exhibit No. 28]. The results are organized in Table 8, below.

*Table 8*

| Note | Interest Accrued as of April, 2008 | Principal Actually Advanced | Maximum Total Claim Under the Note |
|---|---|---|---|
| Hidden Lakes/ UDF | $463,426.62 | $1,500,750.00 | $1,964,176.62 |

The mechanical nature of this analysis, along with the clarity of the record on this issue, leads the Court to estimate a 0% probability of reaching a different result in a full trial on the merits.

*ii. Is the Hidden Lakes/UDF Loan Usurious?*

The Plaintiffs contend that interest under the Hidden Lakes/UDF Note [Exhibit No. 28] is usurious as contracted for, charged, or received. out, and that the penalties resulting under Tex. Fin.Code § 305.001(a–1) should be set off against UDF's claims against Perry.

*(1) What law governs the Hidden Lakes/UDF Note?*

The threshold issue for this analysis is the determination of whether the Hidden Lakes/UDF Note [Exhibit No. 28] is governed by Nevada law or Texas law. Both parties agree that Nevada law has no interest rate usury ceiling applicable to the Hidden Lakes/UDF Note [Exhibit No. 28]. It is also not in dispute that the applicable interest rate usury ceiling under Texas law in accordance with Chapter 303 of the Texas Finance Code is 18% *per annum*.[50] The interest rate contracted for in the Hidden Lakes/UDF Note [Exhibit No. 28] may be as high as 32%,[51] so the conse-

**50.** *See* fn. 40, *supra.*

**51.** The Hidden Lakes/UDF Note [Exhibit No. 28] defines the "Base Rate" as "the lesser of (i) thirty-two percent (32.0%), accrued monthly and compounded quarterly, or (ii) the

Highest Lawful Rate." If the Court were to find that the savings clause in this Note is not to be given effect, then the interest rate contracted for under the Note would be 32.0%.

quences of each state's law applying is clear: if Texas law applies, UDF maybe subject to usury penalties; if Nevada law applies, UDF will not. The Hidden Lakes/UDF Note [Exhibit No. 28] itself contains a choice of law clause in Section 19, stating that this Note will be governed by Nevada law. Thus, the Court must determine if the choice of law clause in the Hidden Lakes/UDF Note [Exhibit No. 28] will be given effect.

 When determining what law to apply to a contract, a federal court must use the choice of law provisions of the forum in which the court sits. *Kucel v. Walter E. Heller & Co.,* 813 F.2d 67, 73 (5th Cir.1987) *citing Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Tex. Bus. & Com.Code. Ann. § 271.005, "[t]he law of a particular jurisdiction governs an issue relating to a qualified transaction if (1) the parties to the transaction agree in writing that the law of that jurisdiction governs the issue, including the validity or enforceability of an agreement relating to the transaction or a provision of the agreement; and (2) the transaction bears a reasonable relation to that jurisdiction." Tex. Bus. & Com.Code. Ann. § 271.005 (Vernon 2009). Thus, there are three elements which must be satisfied for a choice of law clause to be given effect under Tex. Bus. & Com.Code. Ann. § 271.005: (1) the transaction must be a qualified transaction; (2) the parties to the qualified transaction must agree to the choice of law provision in writing; and (3) the transaction must bear a reasonable relation to the chosen jurisdiction.

 The first element is clearly satisfied for the transaction relating to the Hidden Lakes/UDF Note [Exhibit No. 18]. A transaction is a "qualified transaction" under the statute if "a party . . . lends, advances, or receives . . . money or credit with an aggregate value of at least $1 million." *Id.* § 271.001. The loan under the Hidden Lakes/UDF Note [Exhibit No. 28] is a qualified transaction because more than $1 million was lent, so the first element of Tex. Bus. & Com.Code. Ann. § 271.005 is satisfied.

The second element of an agreement in writing is clearly satisfied by the Hidden Lakes/UDF Note [Exhibit No. 28], which contains the choice of law clause, and evidences the agreement of all parties to the loan transaction.

The third element of a reasonable relation to the transaction is further explained in Section 271.004 of the Texas Business & Commerce Code, which provides five circumstances in which a transaction will be found to bear a reasonable relation to a particular jurisdiction:

A transaction bears a reasonable relation to a particular jurisdiction if:

(1) a party to the transaction is a resident of that jurisdiction;

(2) a party to the transaction has the party's place of business or, if that party has more than one place of business, the party's chief executive office or an office from which the party conducts a substantial part of the negotiations relating to the transaction, in that jurisdiction;

(3) all or part of the subject matter of the transaction is located in that jurisdiction;

(4) a party to the transaction is required to perform in that jurisdiction a substantial part of the party's obligations relating to the transaction, such as deliver payments; or

(5) a substantial part of the negotiations relating to the transaction occurred in that jurisdiction and an agreement relating to the transaction was

signed in that jurisdiction by a party to the transaction.

*Id.* § 271.004.

In the dispute at bar, only the first circumstance—where a party is a resident of that jurisdiction—is salient to the analysis. *Id.* § 271.001(b)(1). "Resident" is not defined in Chapter 271 of the Texas Business and Commerce Code. Nor are there any cases interpreting the meaning of the term "resident" as it applies to legal entities, such as a partnership or corporation. Therefore, the Court must turn to the rules of statutory interpretation and Texas cases interpreting the term "resident" in other contexts in order to determine if the choice of law clause will be given effect. UDF was formed under the laws of Nevada, the chosen jurisdiction under the choice of law provision. Thus, the pertinent question before the Court is whether an entity formed under the laws of a state is a resident of that state for the purposes of Tex. Bus. & Com.Code § 271.004. *Id.*

■■■ A legal entity is an "inhabitant" of the state under whose laws it is formed. *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*, 145 S.W.3d 337, 342 (Tex.App.-Houston [14th Dist.] 2004). There is Texas case law stating that "it is a general rule that a corporation is an inhabitant of the state under whose law it is incorporated but that it has a residence wherever it conducts its ordinary business." *Nat'l Truckers Serv., Inc. v. Aero Sys., Inc.*, 480 S.W.2d 455, 457 (Tex.Civ.App.-Ft. Worth 1972); *see also Reddy Ice Corp.*, 145 S.W.3d at 342. This pronouncement would seem to indicate that the terms "inhabitant" and "resident" have different meanings. However, the terms "resident" and "inhabitant" have been found to be synonymous for the purposes of the Texas venue statute. *Reddy Ice Corp.*, 145 S.W.3d at 342, *citing Pittsburg Water Heater Co. of Texas v. Sullivan*, 115 Tex. 417, 282 S.W. 576, 578 (1926); *Taylor v. Wilson*, 99 Tex. 651, 93 S.W. 109, 109 (1906); *Pearson v. West*, 97 Tex. 238, 77 S.W. 944, 945 (1904); *see also Nat'l Truckers Serv., Inc.*, 480 S.W.2d at 457, *quoting* Fletcher Cyc. Corp. Per. Ed. Vol. 8, Sec 4029 ("As a general rule, for jurisdictional purposes, corporations are deemed 'residents' or 'inhabitants' of particular places, and such place is usually the jurisdiction in which it was incorporated."). The term "inhabitant" was further defined in *Reddy Ice Corp.*, where the court interpreted the term as used in Tex. Ins.Code art. 21.42. In its analysis, the court stated that "[i]t is a well established general principle that a corporation is an inhabitant only of the state where it is incorporated," but recognized an occasional exception to this rule that "[t]he inhabitancy of a corporation has been extended to include its principal place of business, usually by statute . . . ." *Reddy Ice Corp.*, 145 S.W.3d at 342. "Residence" for a legal person has *also* been defined as the place where it maintains its principal place of business. *Nat'l Truckers Serv., Inc.*, 480 S.W.2d at 458 ("[a] corporation's residence, in legal contemplation, is the place where it maintains its office and transacts its business—its principal place of business. Its place of residence is the place where its corporate affairs are conducted . . . .").

■■■ Texas law provides that, when interpreting a statute, a court should "try to give effect to legislative intent." *Reddy Ice Corp.*, 145 S.W.3d at 341. The court "look[s] first to the plain and common meaning of the statute's words." *Id.* "If the meaning of the statutory language is unambiguous," a court is to adopt, "with few exceptions, the interpretation supported by the plain meaning of the provision's words and terms." *Id.* "Further, if the statute is unambiguous," a court "must not use rules of construction or other extrinsic aids to create ambiguity." *Id.*

Here, Tex. Bus. & Com.Code § 271.004 is ambiguous because it is not clear which parties qualify as "residents" from simply looking at the plain language of the statute. This ambiguity is further borne out by looking at Texas case law, which, as described above, has at various times defined "residence" as: (1) wherever a legal person conducts its ordinary business; (2) the jurisdiction where a legal person's principal place of business is located; or (3) the jurisdiction under whose laws a legal person is formed. In some areas, "inhabitant" is synonymous with "resident" under Texas law, but in other areas it is not.

As a result, the Court turns to the rules of construction to clarify the meaning of the term "resident" in Tex. Bus. & Com. Code § 271.004. Of particular importance here is the requirement that the Court "give effect to all the words of a statute and not treat any statutory language as surplusage if possible." *City of Amarillo v. Martin*, 971 S.W.2d 426, 430 (Tex.1998). Pursuant to this mandate, Tex. Bus. & Com.Code § 271.004(b)(2) proves to be the key to determining whether UDF III is considered a "resident" of Nevada. Tex. Bus. & Com.Code § 271.004(b)(2) provides that: "[a] transaction bears a reasonable relation to a particular jurisdiction if ... a party to the transaction has the party's place of business or, if that party has more than one place of business, the party's chief executive office or an office from which the party conducts a substantial part of the negotiations relating to the transaction, in that jurisdiction." Tex. Bus. & Com.Code § 271.004(b)(1) (Vernon 2009). If the Court were to interpret "residence" for the purposes of the Tex. Bus. & Com.Code § 271.004(b)(1) as wherever a legal entity conducts its ordinary business, as defined in *Reddy Ice Corp.* and *Nat'l Truckers*, § 271.004(b)(2) would be rendered meaningless. Every condition in

§ 271.004(b)(2) would also satisfy the conduct of ordinary business standard, which is a much broader and easier standard to meet. Defining "residence" as a legal person's principal place of business would also render every part of § 271.004(b)(2) meaningless with the exception of the clause "an office from which the party conducts a substantial part of the negotiations relating to the transaction." Thus, the only definition of "resident" under Texas law that does not render all or part of § 271.004(b)(2) mere surplusage, is where "residence" for a legal entity is found in the jurisdiction under whose laws the legal entity was formed.

This interpretation is supported when construing § 271.004(b)(1) and § 271.004(b)(2) in context with each other. As noted above, certain statutes have extended "inhabitant" status in a given jurisdiction in two distinct situations: (1) when a party is formed under the laws of the jurisdiction; or (2) when a party's principal place of business is located in that jurisdiction. *See Reddy Ice Corp.*, 145 S.W.3d at 342. Under this Court's interpretation, § 271.004(b)(1) and § 271.004(b)(2) do just that. Together, they provide a party the ability to choose the law of the jurisdiction under whose laws the party was formed, or the laws of the jurisdiction where its principal business is located.

Accordingly, the Court finds that UDF is a Nevada resident as defined under Tex. Bus. & Com.Code § 271.004(b)(1), and thus the loan transaction bears a reasonable relationship to Nevada, the chosen jurisdiction in the choice of law provision. All three requirements of Tex. Bus. & Com.Code § 271.005 are therefore satisfied by the transaction.

▮ However, a choice of law clause will not be given effect if it is a subterfuge, even if the transaction bears a reasonable

relation to the chosen jurisdiction. *Cook v. Frazier,* 765 S.W.2d 546, 549 (Tex.App.-Fort Worth 1989, *no writ*). In *Cook,* the only relationship the transaction had to Utah, the chosen jurisdiction, was the borrower's incorporation in Utah, which was required by the lender as a condition of the loan. The *Cook* court stated that "a party's choice of law will be held to constitute a sham or subterfuge when the contacts between the transaction and the chosen state are not reasonably related *or* when the contacts themselves are contrived in order to substantiate the choice of law." *Cook,* 765 S.W.2d at 549 (*emphasis added*). The court's use of the disjunctive "or" indicates that a choice of law can be reasonably related to a transaction, but still be a sham or subterfuge if the contacts leading to the reasonable relation are contrived by the parties for the sole purpose of obtaining the choice of law. The court found that the borrower's incorporation under Utah law was not a valid contact with Utah because it was simply a means to avoid Texas law and substantiate the choice of law provision.

■ Conversely, there is "nothing inherently violative of public policy in contracting for another state's usury laws to apply." *Saturn Capital Corp. v. Dorsey,* No. 01–04–00626–CV, 2006 WL 1767602 (Tex.App.-Houston [1st Dist.] June 29, 2006, *no pet.*); *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson,* 642 F.2d 744, 750–51 (Tex.App.-Houston [1st Dist.] 2006) (so long as the transaction bears a reasonable relationship to the transaction, and the contacts with the chosen state are not contrived for that singular purpose, " '[t]hat the intent of [the parties'] choice of law provision was to avoid the usury laws of some interested jurisdiction is immaterial[;] they are perfectly free to do just that.' "). This Court has already found that the loan transaction between UDF and Hidden Lakes bears a reasonable relation to the chosen jurisdiction of Nevada. The question now before the Court is whether that reasonable relation was contrived for the purpose of circumventing the usury law of Texas.

The Plaintiffs, in Debtor's Post Trial Brief [Main Case Docket No. 735], assert that *Cook* is directly on point with the loan transaction between UDF and Hidden Lakes. However, whereas in *Cook* it was clear from the record that the borrower had never transacted business, maintained an office, or had employees in Utah, the jurisdiction of choice in that case, there is no evidence in the record here regarding whether or not UDF maintains an office, has any employees, or transacts business in Nevada. *See Cook,* 765 S.W.2d at 550–51. Furthermore, there is no evidence of what this Court finds to be the most relevant fact in *Cook*—that the business entity was formed in the jurisdiction of choice to ensure that there was no usury ceiling for the transaction. *Cook,* 765 S.W.2d at 550–51. There is no evidence in the record before this Court that UDF was brought into existence solely for the purpose of circumventing Texas law in this transaction. As a result, this Court cannot find that UDF's status as a Nevada resident was contrived for the purpose of circumventing the usury law of Texas on the current record.

In conclusion, the Court finds that the choice of law clause in the Hidden Lakes/UDF Note [Exhibit No. 28] will be given effect. The loan transaction between UDF and Hidden Lakes is a qualified transaction under Tex. Bus & Com.Code § 271.001 because more than $1,000,000.00 was advanced by UDF. The Hidden Lakes/UDF Note [Exhibit No. 28] is a written agreement between the parties containing a choice of law provision designating Nevada law as governing the agree-

ment. The state of Nevada bears a reasonable relation to the Hidden Lakes/UDF Note [Exhibit No. 28] under Tex. Bus & Com.Code § 271.004 because UDF is a resident of Nevada under Tex. Bus & Com.Code § 271.004(b)(1). As such, the Court finds that the choice of law clause in the Hidden Lakes/UDF Note [Exhibit No. 28] must be given effect, that Nevada law governs this Note, and that, because Nevada has no interest rate usury ceiling applicable to the Hidden Lakes/UDF Note [Exhibit No. 28], there is no usury under this Note. Because there is a dearth of sources interpreting the meaning of "resident" under Tex. Bus & Com.Code § 271.004, and because of the lack of evidence in the record on UDF's contacts with Nevada, the Court estimates that there is a 20% probability of reaching a different result in a full trial on the merits.

*(2) UDF's various defenses to the Plaintiffs' claims of usury.*

In the event the Court is mistaken in its finding that Nevada law governs the Hidden Lakes/UDF Note [Exhibit No. 28], and instead, Texas law governs this Note,[52] the Defendants have raised certain defenses which may defeat the Plaintiffs claims of usury: (1) Perry, as guarantor, has no standing to assert a defense of usury; (2) Hidden Lakes and Southern Colony are equitably estopped from claiming UDF contracted for, charged, or received usurious interest; (3) the savings clauses in Hidden Lakes/UDF Note [Exhibit No. 28] are effective to prevent usurious interest from being contracted for, charged, or received; (4) in the alternative, Perry is not entitled to setoff resulting from a usury penalty, because setoff requires mutual obligations; and (5) in the alternative, if Per-

ry is entitled to setoff due to usury penalties, the amount of setoff is limited to the amount which would be distributed to Perry due to his equity interest in Perry Properties. The merit, or lack thereof, of these defenses does not change the conclusion the Court has reached regarding the applicability of Nevada law (and therefore the absence of usury), but the Court addresses them as an important part of estimating the probability of reaching a different result in a full trial on the merits. The greater the number of meritorious defenses raised by UDF, the less likely that this Court's decision now that no usury penalty should be applied against Perry's obligations will be discounted (based on the probability of reaching a different result in a full trial on the merit s). The Court's analysis of UDF's defenses is largely identical to the defenses posed by UDF III, as discussed in Section B(ii), above, so that analysis is referred to where appropriate. The defenses are addressed in turn.

● *(a) Standing of Perry, as Guarantor, to obtain setoff resulting from usury penalties*

The Defendants contend that Perry, as guarantor, may not assert a claim of usury, even if Hidden Lakes could prove usury under the Hidden Lakes/UDF Note [Exhibit No. 28], and further, even if Hidden Lakes does succeed on its usury claims, Perry is not entitled to setoff from those penalties. For the same reasons as delineated in Section C(ii) of the Conclusions of Law, above, Perry does not have standing to assert a defense of usury, nor is he entitled to any setoff resulting from usury penalties. Perry is, again, an absolute guarantor under the UDF Guaranty

---

**52.** If the choice of law provision were not given effect, Texas law would govern the Hidden Lakes/UDF Note [Exhibit No. 28], because Texas is the state with "the most signifi-

cant relationship to the issues presented for determination." *Reddy Ice Corp.,* 145 S.W.3d at 340.

Agreement [Exhibit No. 34]. The UDF Guaranty Agreement [Exhibit No. 34] does not include any reference to interest rates, let alone a specific rate or fees which could possibly constitute a usurious provision; and, as a result, Perry does not have standing, as guarantor, to raise a defense of usury or obtain a setoff resulting from usury penalties. For the same reasons the Court gave in analyzing the UDF III Notes, the Court estimates a 0% probability of reaching a different result in a full trial.

● *(b) Equitable Estoppel*

The Defendants contend that the Plaintiffs should be equitably estopped based on an opinion letter prepared by Locke, Liddell, & Sapp, LLP [Exhibit No. 107] (the UDF Opinion Letter). The Defendants assert that, because the UDF Opinion Letter was prepared and delivered to UDF by Locke, Liddell, & Sapp, LLP at the request of the Plaintiffs, and because the UDF Opinion Letter contains opinions to the effect that the Hidden Lakes/UDF Note [Exhibit No. 28] is not usurious, the Plaintiffs should be equitably estopped from asserting that this Note is usurious.

The facts at issue with the UDF Opinion Letter are nearly identical to those at issue with the Opinion Letters that were delivered to UDF III—the only difference being that the Plaintiffs' contentions contradict the opinion that the Hidden Lakes/UDF Note [Exhibit No. 28] is governed by Nevada law, as opposed to contradicting the opinion that the Original Hidden Lakes/UDF III and Southern Colony/UDF III Notes are not usurious. As a result, for the same reasons set forth in Section C(ii) of the Conclusions of Law, the Court finds that equitable estoppel of the Plaintiffs' usury claims is not appropriate. Further, for the same reasons the Court gave in analyzing the UDF III Notes, the Court estimates a 20% probability of reaching a different result in a full trial.

● *(c) Effect of the Savings Clause*

The Defendants assert that the savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28] prevent UDF from contracting for, charging, or receiving usurious interest. This Court has concluded, above, that UDF has not contracted for usurious interest, but in the event this conclusion is incorrect, an analysis of the savings clause may prove important. The savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28], and the facts at issue for the loan between Hidden Lakes and UDF, are almost identical in all respects material to this analysis. Therefore, the Court finds that, as such, it is proper for the Court to find that the savings clauses in the Hidden Lakes/UDF Note [Exhibit No. 28] have legal effect, and preclude UDF from being subject to usury penalties resulting from this Note.[53] For the same reasons this Court gave in its analysis of the savings clauses in the UDF III Notes (Section C(ii) of the Conclusions of Law), the Court estimates that there is a 20% probability of reaching a different result in a full trial on the merits.

*iii. Is UDF barred from bringing a deficiency action in connection with the Hidden Lakes Property by Nevada law?*

The Plaintiffs contend that if Nevada law does govern the Hidden Lakes/UDF

---

53. Because UDF charged and received interest pursuant to the Hidden Lakes/UDF Note [Exhibit No. 28], which contains the savings clauses, it will not be liable for usury penalties resulting from charging or receiving those amounts, so long as whatever interest above and beyond the legal limit is returned to Hidden Lakes. *See C & K Invs.,* 248 S.W.3d at 244; Tex. Fin.Code Ann. § 305.101 (Vernon 2009).

Note [Exhibit No. 28], UDF is barred from seeking a deficiency action on this Note in connection with the foreclosure sale of the Hidden Lakes Property by Nev.Rev.Stat. § 40.455. Nev.Rev.Stat. § 40.455 (2009).

Nev.Rev.Stat. § 40.455 provides that a deficiency action may be brought by a creditor within six months after a foreclosure or trustee's sale, or else it is barred. Nev.Rev.Stat. § 40.455, *see, e.g., Murphy v. Federal Deposit Ins. Corp.,* 106 Nev. 26, 787 P.2d 370 (1990). Nevada law holds that guarantors of promissory notes secured by real property which has been sold under a deed of trust are entitled to the protection of the hearing and the limitations period of Nev.Rev.Stat. § 40.455. *First Interstate Bank of Nev. v. Shields,* 102 Nev. 616, 730 P.2d 429, 431 (1986) ("[O]bligors are assured that creditors in Nevada may not reap a windfall at an obligor's expense by acquiring the secured realty at a bid price unrelated to the fair market value of the property and thereafter proceeding against available obligors for the difference between such deflated price and the balance of the debt."). The foreclosure sale of the Hidden Lakes Property took place on March 3, 2009. The limitations period under Nev.Rev.Stat. § 40.455 expired on September 3, 2009.

Simply looking at Nevada law, it appears that UDF would in fact be barred from bringing a deficiency action against Perry or Hidden Lakes in connection with the Hidden Lakes Property. However, UDF contends that 11 U.S.C. § 108(c) extends the limitations period of Nev.Rev. Stat. § 40.455 to the latter of the expiration of the period or 30 days after notice of the termination of the automatic stay. The automatic stay in the main case went into effect on April 11, 2008, prior to the natural expiration of the limitations period under Nev.Rev.Stat. § 40.455, and has not

yet terminated. Therefore, if 11 U.S.C. § 108(c) has extended the limitations period of Nev.Rev.Stat. § 40.455, UDF can bring a deficiency action. Conversely, if it has not extended the limitations period (as the Plaintiffs contend), UDF is barred from doing so.

The issue before the Court is rather novel: is a statute of limitations, limiting the period in which a deficiency action may be brought, extended when the guarantor of the loan the deficiency is sought to satisfy files a petition under Chapter 11 before the limitations period expires? The Plaintiffs contend that, because the automatic stay under 11 U.S.C. § 362 never prevented UDF from initiating a deficiency action against Hidden Lakes (the borrower) within the limitations period of Nev.Rev.Stat. § 40.455, 11 U.S.C. § 108(c) should not operate to extend the limitations period for bringing deficiency action against Perry (the guarantor).

The Court finds *McCartney v. Integra Nat'l Bank, N.,* instructive on this issue. 165 B.R. 18 (Bankr.W.D.Pa.1994). The facts of *McCartney* are as follows: The creditor in the case, Integra, made a loan to a restaurant which was guaranteed by McCartney, the debtor in the case. The guaranty was secured by a second mortgage lien on two parcels of real property owned by the McCartney. Some years later, McCartney filed a petition under Chapter 13. Subsequently, a sheriff's sale of the restaurant's property took place at which Integra purchased all of the property. Integra later filed a proof of claim for the deficiency on the loan that McCartney had guaranteed. Integra did not file under the applicable Pennsylvania deficiency judgment statute and the limitations period expired. McCartney asserted that Integra had failed to comply with the Pennsylvania Deficiency Judg-

ment Act by failing to file a petition in the Court of Common Pleas to fix the fair market value of the restaurant property within six months of the Sheriff's sale, and therefore Integra's claim was released and satisfied. Integra asserted that it did not file a petition under the deficiency judgment act because: (1) the restaurant owned nothing other than the property sold at the sheriff's sale; and (2) McCartney, as guarantor of the debt, was a necessary party to the action and was protected against any state court proceedings by virtue of the automatic stay, and (3) even if a state court deficiency proceeding was appropriate, the deadline for the initiation of such a proceeding had been suspended by 11 U.S.C. § 108(c).

The *McCartney* court acknowledged that if there had been no bankruptcy filing, Integra would clearly be barred from pursuing a deficiency action against McCartney. However, the court found that with the bankruptcy of McCartney, the guarantor of the loan, it was necessary to extend the limitation period under 11 U.S.C. § 108(c). The court noted, that, were Integra to pursue a deficiency action against the restaurant, it would be required to join McCartney as a necessary party and serve him with notice thereof—an action which would violate the automatic stay provisions of 11 U.S.C. § 362.

The same analysis applies in the case before this Court. Nev.Rev.Stat. § 40.457 requires that: "[b]efore awarding a deficiency judgment under Nev.Rev.Stat. § 40.455, the court shall hold a hearing .... [n]otice of such hearing shall be served on *all defendants ... against whom a deficiency judgment is sought....*". Nev.Rev.Stat. § 40.457(1) (2009). The consequence of the requirement in Nev.Rev.Stat. § 40.457 that notice be served on all defendants against whom a deficiency judgment is sought is that, if

the automatic stay did not extend the limitations period, UDF would face the same dilemma Integra faced in *McCartney*: if UDF were to bring a deficiency action against both Perry and Hidden Lakes within the six month limitations period, it would violate the automatic stay under 11 U.S.C. § 362. On the other hand, if UDF were to seek a deficiency action against (only) Hidden Lakes within the limitation period, it would waive its ability to seek a deficiency judgment against Perry by not joining him to the action and failing to provide him the required notice.

■ Provisions of the Code preempt state laws when they conflict, as they do here. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963) (state law is preempted by federal law when "compliance with both federal and state regulations is a physical impossibility," for example, it would be physically impossible for a party to comply with both state and federal regulations if "the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, which the California test excluded from the State any avocado measuring less than 8% oil content."). Therefore, the Court finds that, pursuant to 11 U.S.C. § 108(c), the automatic stay has extended the limitations period for UDF to pursue a deficiency action in connection with the Hidden Lakes Property.

The Court is quite comfortable with the reasoning provided in *McCartney*, and so estimates a low probability of reaching a different result in a full trial on the merits. But the Court also recognizes that there is limited case law on this issue, and *McCartney*, persuasive though its reasoning may be, is nonetheless a district court decision from a different jurisdiction. As a result, the Court estimates that there is a 15%

probability of reaching a different result in a full trial on the merits.

### iv. Should the Court equitably subordinate the claims of UDF?

The Plaintiffs contend that UDF has engaged in inequitable conduct as an "insider" which has resulted in injury to Perry's creditors or conferred an unfair advantage to UDF. These allegations are identical to those leveled against UDF III, as already discussed herein. Hence, the Court's analysis and conclusion is the same. The Fifth Circuit has laid out a three-pronged test to determine "whether and to what extent a claim should be equitably subordinated: (1) the claimant must have engaged in some sort of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d at 699, *citing Matter of Missionary Baptist Found. of Am., Inc.*, 796 F.2d at 760. The record does not indicate that: (1) UDF engaged in any sort of inequitable conduct, or (2) that the misconduct resulted in injury to Perry's creditors or conferred an unfair advantage on UDF. Therefore, two prongs of the *Clark Pipe* test are not met and, accordingly, the Court should not equitably subordinate the claims of UDF. For the same reasons set forth by this Court in analyzing the claims of UDF III, the Court estimates a 0% probability of reaching a different result in a full trial on the merits.

### v. Does Perry have a right to a credit as a result of the foreclosure sale of the Hidden Lakes Property?

 Under Tex. Prop.Code § 51.003, any person against whom a deficiency is sought is entitled to a credit for the difference between the amount of liens against the property and the fair market value of the property on the date of the foreclosure. Tex. Prop.Code Ann. § 51.003(b) (Vernon 2010). The Fifth Circuit and at least one Texas state appellate court have held that the provisions of Tex. Prop.Code § 51.003 providing for an offset apply to guarantors like Perry. *LaSalle Bank N.A. v. Sleutel*, 289 F.3d 837, 840 (5th Cir.2002), *citing Long v. NCNB— Texas Nat. Bank*, 882 S.W.2d 861 (Tex. App.-Corpus Christi 1994). However, in the UDF Guaranty Agreement [Exhibit No. 34] pertaining to the Hidden Lakes/ UDF Note [Exhibit No. 28], Perry waives his right to any "circumstances that might otherwise cause a legal or equitable discharge or defense." The Fifth Circuit, interpreting Texas law, has held that such contractual waivers will be given effect. *LaSalle Bank N.A.*, 289 F.3d at 840. In *LaSalle Bank*, the Fifth Circuit observed that although Tex. Prop.Code 51.003 does not itself address waiver, other provisions of the Texas Property Code do, but only to specifically prevent waiver of those provisions. *Id.* at 841. Applying the principle of statutory construction of *inclusio unius est exclusio alterius*—meaning that it is to be assumed that the purposeful inclusion of a term implies the purposeful exclusion of a term that is absent—the Fifth Circuit held that the exclusion of a term specifically preventing waiver of set off rights in the language of Tex. Prop.Code § 51.003 indicates the Texas Legislature's intent that offset rights can be contractually waived with respect to guarantors. A Texas appellate court concurred with the Fifth Circuit's analysis of Tex. Prop.Code § 51.003 in dicta while finding that a guarantor can waive its rights under Tex. Prop.Code 51.005 for reasons that are identical to those given in *LaSalle*. *Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 279–81

(Tex.App.-Houston [1st Dist.] 2004). Therefore, following the precedent of the Fifth Circuit, this Court finds that Perry waived his right to offset under Tex. Prop. Code 51.003 and, accordingly, is not entitled to any offset on that basis.

On the basis of Fifth Circuit precedent and the abundant clarity of the language of the Hidden Lakes/UDF Note [Exhibit No. 28] that legal defenses such as deficiency setoff are waived, this Court estimates a 0% probability of reaching a different result in a full trial on the merits.

*vi. Should the Court consider the ability of the borrower to pay the obligation in estimating the dollar amount of Perry's Guarantees?*

The Plaintiffs argue that, in estimating the amount of Perry's Guarantees, the Court should take into account the ability of the principal obligor to pay the obligation. As noted above, under Texas law, a guaranty of payment (or absolute guaranty) is "absolute rather than conditional, primary rather than secondary, and guarantees of payment rather than guarantees of collection." *Universal Metals & Mach., Inc.,* 539 S.W.2d at 877–78. Under Texas law, "one who guarantees payment of a note and waives the requirement that the holder of the note exhaust its rights against the maker, becomes an absolute guarantor." *Greenway Bank & Trust of Houston,* 679 S.W.2d at 595; *Universal Metals & Mach., Inc.,* 539 S.W.2d at 877–78. The lender may therefore bring an action against the guarantor of payment without joining the principal obligor. *Ferguson,* 582 S.W.2d at 541–42. If Perry's guaranty of the Hidden Lakes/UDF Note [Exhibit No. 28] is a guaranty of payment, then he is a principal obligor under Texas law, and UDF may bring an action against him without joining either Hidden Lakes or Southern Colony. Under these circumstances, the Court will not look to the ability of any principal obligor in estimating the amount of any claim against Perry.

The facts in this dispute indicate that Perry's guarantees to UDF are guarantees of payment. The identical language of the Hidden Lakes/UDF Guaranty Agreement [Exhibit No. 34] makes this conclusion abundantly clear: "[e]ach Guarantor hereby absolutely and unconditionally guarantees, and becomes surety for, the full, timely and complete payment when due...." The Hidden Lakes/UDF Guaranty Agreement [Exhibit No. 34] further provides that "[e]ach Guarantor's obligation under this Guaranty is unconditional, absolute and enforceable, irrespective of ... whether recovery against Borrower with respect to the Guaranteed Obligations in whole or in part is prevented by bankruptcy, operation of law, or otherwise...." Finally, the Hidden Lakes/UDF Guaranty Agreement [Exhibits No. 34] includes an express waiver of the requirement that the holder of the note exhaust its rights against the maker, stating, "Lender may, in its sole discretion and without notice, take or refrain from taking any action that might otherwise be deemed a legal or equitable release or discharge of Guarantors' obligations under this Guaranty, without either impairing or affecting the joint and several liability of Guarantors for the full, timely and complete payment of the Guaranteed Obligations, which actions might include, by way of illustration and not limitation: ... (c) the absence of any attempt to collect the Guaranteed Obligations from Borrower or any other person or entity primarily or secondarily liable for the Guaranteed Obligations or any other action to enforce Lender's rights with respect to the Guaranteed Obligations." Accordingly, the Court recognizes Perry as an absolute guarantor, and will not look to the ability of primary obligors to pay in estimating the claims against him. For

the same reasons provided by this Court in analyzing the claims of UDF III, the Court estimates a 0% probability of reaching a different result in a full trial.

### vii. Conclusion: UDF's claims

The Court has found that UDF has a maximum claim under the Hidden Lakes/ UDF Note [Exhibit No. 28] of $1,964,176.62. The Court has also found that UDF's claim should not be reduced on the Plaintiffs' legal grounds of (1) usury; (2) actions to recover deficiency being barred by Nevada law; (3) equitable subordination; (4) right to setoff as a result of the foreclosure sale of the Hidden Lakes Property; or (5) ability of the borrower to pay the obligation.

The Court has estimated that after a full trial on the merit s, there is a 20% probability of changing its conclusion on the issue of usury, and a 15% chance of changing its conclusion on the issue of whether Perry has a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property. However the Court will not discount UDF's claim due to the probability of changing its conclusion on the usury issue because the Court has found that Perry does not have standing to raise a defense of usury or to obtain setoff from any usury penalties for the same reasons as discussed in analyzing UDF III's claims. On the other hand, the Court will discount UDF's claims on the basis of the estimated 15% probability of reaching a different result in a full trial on the merits on the issue of whether Perry has a right to setoff as a result of the foreclosure sale of the Hidden Lakes Property.

To do so, the Court calculates the probable reduction of UDF's claim should this Court ultimately conclude that Perry is entitled to such a setoff. Tex. Prop.Code § 51.003(c) provides that "[i]f the court determines that the fair market value is greater than the sale price of the real property at the foreclosure sale, the persons against whom recovery is sought are entitled to an offset against the deficiency in the amount by which the fair market value, less the amount of any claim, indebtedness, or obligation of any kind that is secured by a lien or encumbrance on the real property that was not extinguished by the foreclosure, exceeds the sale price." Tex. Prop.Code Ann. § 51.003(c) (Vernon 2009). "Competent evidence of value may include: (1) expert opinion testimony; (2) comparable sales; (3) anticipated marketing time and holding costs; (4) cost of sale; and (5) the necessity and amount of any discount to be applied to the future sales price or the cash flow generated by the property to arrive at a current fair market value." Id. § 51.003(b).

The Court has been given three credible data points for the fair market value of the Hidden Lakes Property: (1) Osenbaugh's expert testimony that the value of the property is approximately $12,000,000.00 [November 11, 2009 Tr. 75:19–76:2]; (2) Moayedi's testimony regarding the marketing and holding costs for the Hidden Lakes Property, as well as his testimony regarding whether he, as the agent for CTMGT, would have paid $2,100,000.00 for the Hidden Lakes Property had he known about the Hidden Lakes Lawsuit [November 11, 2009 Tr. 132:19–137:23]; and (3) the sum of the sale price at the foreclosure sale (approximately $2,100,000.00) and the amount of the unextinguished debt to RBC secured by the Hidden Lakes Property on the date of the sale (approximately $6,700,-000.00)—a total of approximately $8,800,000.00. [Finding of Fact No. 24.]

Moayedi's testimony indicates that the Hidden Lakes Property will require substantial marketing time and holding costs: the Hidden Lakes Lawsuit will probably have to be resolved before homebuilders

are likely to sign on to build on the property, and an amenity center still remains to be built on the property (costing an estimated $1,000,000.00). [November 11, 2009 Tr. 132:19–137:23]. Mr. Moayedi also testified, in his capacity as agent of the purchaser CTMGT, that CTMGT would not have paid $2,100,000.00 for the Hidden Lakes Property if it had known the full extent of the legal dispute over drainage and the artificial lake on the property. *Id.*

The Court finds both Osenbaugh and Moayedi to be credible, though it finds Osenbaugh's testimony somewhat less credible due to Osenbaugh's heavy reliance on property values from 2007 in her method of calculating the value of the Hidden Lakes Property. Osenbaugh asserts that the value of Hidden Lakes is approximately $2,200,00.00 greater than the value for the property based on the sale price and the debt secured by the property. On the other hand, Moayedi asserts that, had he been aware of the pending lawsuit relating to the Hidden Lakes Property, he would have valued the property at less than what the sale price would indicate. How much less is not clear from the record.

On the facts before it, the Court is inclined to find that $8,800,000.00 is an accurate assessment of the fair market value of the Hidden Lakes Property. There is credible testimony indicating that the fair market value could be either higher or lower; thus, $8,800,000.00 appears to be a sensible midpoint value that is supported by the compelling fact that it is the amount a party was actually willing to pay for it.

Accordingly, the Court finds that there is no setoff for Perry to have in relation to the foreclosure sale of the Hidden Lakes Property. As a result, the Court discounts UDF's claims by $0 based on the 15% probability of reaching a different result in a full trial (*i.e.*, $0 (setoff due to Perry) × 15% (probability of reaching a different result) = $0).

**In conclusion, the Court estimates that UDF has a claim of $1,964,176.62 under the Hidden Lakes/UDF Note [Exhibit No. 28].** The results of this analysis are summarized in Table 9, below:

*Table 9*

| Note | Claim before discount | Discount based on probability of reaching a different result in a full trial on the merits | Net Claim Under the Note |
|---|---|---|---|
| Hidden Lakes/ UDF | $1,964,176.62 | $ 0 | $1,964,176.62 |

### V. Conclusion

**In sum, for purposes of any plan confirmation hearing held in this case, the Court estimates that UDF III has a total claim of $5,555,838.77, and that UDF has a total claim of $1,964,176.62. Both of these claims are unsecured claims.**

An order consistent with this Opinion will be entered on the docket simultaneously with the entry on the docket of this Opinion.